[Crim. No. 13651. In Bank. Dec. 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID KEITH HOOD, Defendant and Appellant.

## COUNSEL

Kelvin L. Taylor, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci, John T. Murphy and Jerome C. Utz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TRAYNOR, C. J.**—An indictment charged defendant in count I with assault with a deadly weapon upon a peace officer, Alfred Elia (Pen. Code, § 245, subd. (b)), in count II with battery upon a peace officer, Donald Kemper (Pen. Code, §§ 242, 243), and in count III with assault with intent to murder Officer Elia (Pen. Code, § 217). A jury found him guilty on counts I and III and not guilty on count II, and the trial court entered judgment on the verdicts. The trial court also ordered that "Defendant shall serve the sentence in Count Three only . . . as the sentence in Count One . . . is withheld and will only be imposed if the sentence for Count Three is not carried out for any reason. . . ." Defendant appeals.

On September 11, 1967, at about 2 a.m., defendant, his brother Donald, and a friend, Leo Chilton, all of whom had been drinking for several hours, knocked on the door of the house of Susan Bueno, defendant's former girlfriend, and asked if they could use the bathroom. Susan said no, but defendant forced his way in and started to hit her. He knocked her to the floor and kicked her. Donald Hood then took Susan aside, and defendant, Chilton, and Gene Saunders, a friend of Susan's who was staying at the house, went to the kitchen and sat down.

Gilbert A. Nielsen, Susan's next-door neighbor, was awakened by the sound of Susan's screams and called the police. Officers Elia and Kemper responded to his call. After talking to Nielsen, they went to Susan's house, knocked on the door, which was opened by Stella Gonzales, Susan's cousin, and asked if "Susie" was there. Miss Gonzales said, "Yes, just a minute," and in a few seconds Susan came running to the door crying. Officer Elia

asked Susan if she had been beaten and who did it. She pointed to the kitchen and said, "They're in there right now." The two officers walked through the living room, where Susan, Susan's seven-year-old son Ronnie, and Stella remained, and went into the kitchen. There they observed defendant on the righthand side of the room leaning against a door. On the left side of the kitchen, the three other men were seated at a table. Officer Elia walked to the middle of the room and questioned the men at the table. Defendant interrupted the questioning and asked Officer Elia if he had a search warrant. Officer Elia replied that he did not need one since the person who rented the house had given him permission to enter. Defendant then directed a stream of obscenities at Officer Elia, who turned and, according to his testimony, started to place defendant under arrest for a violation of Penal Code section 415 (using vulgar, profane, or indecent language within the presence or hearing of women or children). He got no further than to say, "Okay fella, you are. . . ," when defendant swung at him with his fist. When Officer Kemper attempted to go to Officer Elia's assistance, Donald Hood jumped on him from behind. During the ensuing struggle, Officer Elia fell with defendant on top of him in a corner of a pantry adjoining the kitchen at the rear. While struggling on the floor, Officer Elia felt a tug at his gun belt and then heard two shots fired.

A third officer, Laurence Crocker, who had arrived at the house shortly after the other two officers, came into the kitchen as the scuffle between Officer Elia and defendant was beginning. After he had control of Donald Hood, he looked across the kitchen and saw defendant with a gun in his right hand. He testified that defendant pointed the gun towards Officer Elia's midsection and pulled the trigger twice.

Both Officers Crocker and Kemper testified that after the shots, defendant's arm came up over his head with the revolver in his hand. The struggle continued into the bathroom. Defendant was finally subdued when Officer Elia regained possession of the gun and held it against the side of defendant's neck. Officer Elia then noticed that defendant had shot him once in each leg.

The foregoing evidence is clearly sufficient to support the verdicts.

Defendant contends that the court failed properly to instruct the jury with respect to lesser included offenses to the offense charged in count I, and that it also erred in instructing on the effect of intoxication with respect to the offenses charged in both counts I and III.

The court instructed that, "The offense of assault with a deadly weapon, with which defendant . . . is charged in Count One of the indictment necessarily includes the lesser offense of assault." This instruction incorrectly referred to the crime charged merely as assault with a deadly weapon

(Pen. Code, § 245, subd. (a))[1] instead of assault with a deadly weapon upon a peace officer (Pen. Code, § 245, subd. (b)).[2] It thus served to blur the distinctions between these two offenses. Moreover, the court did not instruct the jury that assault with a deadly weapon upon a peace officer includes the lesser offenses of assault with a deadly weapon as well as simple assault, or that the jury could convict defendant of no more than assault with a deadly weapon if it found that Officer Elia was not engaged in the performance of his duties or that defendant neither knew nor reasonably should have known that he was so engaged. As instructed, the jury could only convict defendant of simple assault or assault with a deadly weapon upon a peace officer. Defendant, however, did not request an instruction that he could be found guilty of the lesser offense of assault with a deadly weapon. Accordingly, the question presented is whether the court erred in failing to give such an instruction on its own motion.

■ The general rule is that the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so, but need not instruct on its own motion on specific points developed at the trial. (*People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Jackson* (1963) 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937]; *People* v. *Bevins* (1960) 54 Cal.2d 71, 77 [4 Cal.Rptr. 504, 351 P.2d 776]; *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Putnam* (1942) 20 Cal.2d 885, 890 [129 P.2d 367]; *People* v. *Warren* (1940) 16 Cal.2d 103, 116-117 [104 P.2d 1024]. See *People* v. *Martin* (1919) 44 Cal.App. 45 [185 P. 1003]; *People* v. *Stirgios* (1913) 23 Cal.App. 48 [136 P. 957]; *People* v. *Rogers* (1912) 163 Cal. 476, 484 [126 P. 143] (first statement of the rule in substantially its present form); *People* v. *Olsen* (1889) 80 Cal. 122, 128-129 [22 P. 125] (rule implied in dictum).) In *People* v. *Wade, supra,* we pointed out that the "general principles of law governing the case" are "those principles of law commonly or closely and openly connected with the facts of the case before the court." As we indicated in *Wade,* the rule is designed to afford protection against the inadvertence of trial counsel.

As the Court of Appeal noted in *People* v. *Cooper* (1968) 268 Cal. App.2d 34, 36-41 [73 Cal.Rptr. 608], the cases establishing this general

---

[1]"Every person who commits an assault upon the person of another with a deadly weapon or instrument or by any means of force likely to produce great bodily injury is punishable. . . ."

[2]"Every person who commits an assault with a deadly weapon or instrument or by any means likely to produce great bodily injury upon the person of a peace officer or fireman, and who knows or reasonably should know that such victim is a peace officer or fireman engaged in the performance of his duties, when such peace officer or fireman is engaged in the performance of his duties shall be punished. . . ."

rule are in conflict with another line of cases that hold that it is not error for the court to fail to instruct on lesser included offenses on its own motion, even though such an instruction would be supported by the evidence. (*People* v. *Bailey* (1904) 142 Cal. 434 [76 P. 49]; *People* v. *Hite* (1901) 135 Cal. 76 [67 P. 57]; *People* v. *Franklin* (1886) 70 Cal. 641 [11 P. 797]; *People* v. *Smith* (1963) 223 Cal.App.2d 225, 237 [35 Cal.Rptr. 719]; *People* v. *Calderon* (1957) 155 Cal.App.2d 526, 530 [318 P.2d 498]; *People* v. *Williams* (1956) 141 Cal.App.2d 849, 853 [297 P.2d 759].) We believe that there is no basis for such an exception to the general rule. Accordingly, to the extent that the foregoing cases support a special rule for lesser included offenses, they are overruled.

■ We must therefore determine whether the distinction between assault with a deadly weapon upon a peace officer and assault with a deadly weapon is a principle of law "commonly or closely and openly connected with the facts of the case before the court" (*People* v. *Wade, supra*), and whether the evidence in this case clearly indicated that Officer Elia might not have been engaged in the performance of his duties or that defendant might not have known or had reason to know that he was so engaged.

The officers were in uniform and defendant had reason to know they were lawfully present in the house to investigate a disturbance. If there was no evidence that Officer Elia exceeded the scope of his duties, the distinction between the two offenses would not be a significant issue. There was such evidence, however. Defendant testified that as Officer Elia turned and came toward him, he thought the officer was drawing his gun and was going to shoot him. This evidence was sufficient to raise the question whether Officer Elia had become angered and ceased to be engaged in the performance of his duties, or whether defendant could reasonably have so believed. Indeed, it was this very evidence that raised the issue of self-defense, on which the court instructed fully. Thus, the issue whether the officer exceeded the scope of his duties, or whether defendant reasonably believed he had, was "closely and openly connected with the facts" before the court, and it was therefore error for the court to fail to instruct on the lesser included offense of assault with a deadly weapon. Moreover, that error was prejudicial, for it deprived defendant of his constitutional right to have the jury determine every material issue presented by the evidence. (*People* v. *Graham* (1969) 71 Cal.2d 303, 310 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Mosher* (1969) *ante,* pp. 379, 393 [82 Cal.Rptr. 379, 461 P.2d 659].)

■ There is no merit in the contention that in rejecting the defense of self-defense the jury must have rejected the evidence that Officer Elia exceeded

the scope of his duties. The court instructed the jury that "Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his ground and thus defend himself is not immediately available to him, but, instead he must first decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest. Only when he has done so will the law justify him in thereafter standing his ground and using force upon his antagonist." The court also instructed the jury that, "If an assault with the fists is being made on a person, but without intent to kill or to do great bodily harm, and if the assault is not likely to produce great bodily injury, and if the one thus attacked is not deceived as to the character of such an assault, he is not justified in using a deadly weapon in self defense." The jury could have rejected the defense of self-defense under either of these instructions without reaching the question whether Officer Elia exceeded the scope of his duties by initiating an assault upon defendant, or the question whether defendant reasonably so believed. Under the first instruction the jury could have found that defendant sought or induced a quarrel by the stream of obscenities directed at Officer Elia and thereafter failed to seek to withdraw from the fray, thus forfeiting his right to defend himself. Under the second instruction the jury could have found that at the time defendant seized the gun, he should have realized that the officer's assault upon him did not justify the use of a deadly weapon. Under either of these hypotheses, defendant could still be not guilty of assault with a deadly weapon upon a peace officer within the meaning of subdivision (b) of section 245 if Officer Elia exceeded the scope of his duties by responding to defendant's insults with excessive force, or if defendant reasonably so believed. (*People v. Curtis* (1969) 70 Cal.2d 347, 357, fn. 9 [74 Cal.Rptr. 713, 450 P.2d 33].) We note in fairness to the trial court that its failure so to instruct the jury was justified at that time by such decisions as *People* v. *Baca* (1966) 247 Cal.App.2d 487, 495 [55 Cal.Rptr. 681] (subsequently disapproved in *People* v. *Curtis, supra,* p. 356, fn. 6).

██ The judgment must also be reversed as to count III, for the court gave hopelessly conflicting instructions on the effect of intoxication.[3]

---

[3]The court instructed:

"To constitute the crime of assault with intent to commit murder there must exist an assault and, in the mind of the perpetrator, a specific, preconceived intent to kill a human being.

"In a crime such as that of which defendant, DAVID KEITH HOOD, is charged in Count Three of the indictment, there must exist a union or joint operation of act or conduct and a certain specific intent.

"In the crime of Assault With Intent to Commit Murder (Penal Code Section 217),

Although the court correctly instructed the jury to consider the evidence that defendant was intoxicated in determining whether he had the specific intent to commit murder, it followed that instruction with the complete text of CALJIC No. 78 (revised), which applies to crimes that require proof only of a general criminal intent. The court in no way made clear to the jury that the latter instruction did not apply to the charge of assault with intent to commit murder. The giving of such conflicting instructions with respect to a crime requiring proof of a specific intent is error (*People* v. *Spencer* (1963) 60 Cal.2d 64, 87 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Ford* (1964) 60 Cal.2d 772, 796 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Arriola* (1958) 164 Cal.App.2d 430, 434-435 [330 P.2d 683]). That error was clearly prejudicial in this case. There was substantial evidence that defendant was drunk. He testified that he was not aware that he ever had the gun in his possession or fired it. Its discharge during the scuffle could be reconciled with an intent to kill, an intent to inflict only bodily injury, or with no intent to fire it at all. Had the jury not been given conflicting instructions on the significance of defendant's intoxication, it is reasonably probable that it would have reached a result more favorable to defendant on count III. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

To guide the trial court on retrial, we consider the question of the effect of intoxication on the crime of assault with a deadly weapon.

Many cases have held that neither assault with a deadly weapon nor simple assault is a specific intent crime.[4] A number of these cases held that

there must exist in the mind of the perpetrator the specific intent to murder a human being, and unless such intent so exists that crime is not committed.

"In the crime of assault with intent to commit murder of which the defendant, DAVID HOOD, is accused in count III of the indictment, a necessary element is the existence in the mind of the defendant of the specific intent to commit murder.

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent.

"Intoxication of a person is voluntary if it results from his willing partaking of any intoxicating liquor, drug or other substance when he knows that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect as a possibility.

"Our law provides that 'no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.'

"This means that drunkenness, if the evidence shows that the defendant was in such a condition when allegedly he committed the (a) crime charged, is not of itself a defense in this case. It may throw light on the occurrence and aid you in determining what took place, but when a person in a state of intoxication, voluntarily produced by himself, commits a crime such as that (any of those) charged against the defendant in this case, the law does not permit him to use his own vice as a shelter against the normal legal consequences of his conduct."

[4]*People* v. *McMakin* (1857) 8 Cal. 547, 548; *People* v. *Marseiler* (1886) 70 Cal. 98 [11 P. 503]; *People* v. *Franklin* (1886) 70 Cal. 641 [11 P. 797]; *People* v. *Leyba* (1887) 74 Cal. 407, 409 [16 P. 200]; *People* v. *Wells* (1904) 145 Cal. 138, 140 [78 P. 470]; *People* v. *McCoy* (1944) 25 Cal.2d 177, 194 [153 P.2d 315]; *People* v.

an assault with a deadly weapon could be predicated on reckless, as well as intentional, conduct. " 'Where the act is both unlawful and wrongful, and well calculated to inflict serious personal injury, the law will imply malice and an unlawful intention and override any actual intention existing in the mind of the aggressor. Thus, while it is not an assault to fire a gun in the air for the purpose of frightening another, it is an assault, without regard to the aggressor's intention, to fire a gun at another or in the direction in which he is standing. The law will not tolerate such a reckless disregard for human life.' " (*People* v. *Peak, supra,* 66 Cal. App.2d 894, 901, quoting from 4 Am.Jur., § 6, p. 130.) Penal Code section 245 "provides that 'Every person who commits an assault . . . with a deadly weapon or instrument or by any means or force *likely to produce great bodily injury,*' is guilty of that offense. The *intention* to actually injure another is not mentioned in that section. . . . If a rifle is deliberately and unlawfully fired toward another person in a manner 'likely to produce great bodily injury,' an assault with a deadly weapon may be accomplished even if the defendant does not really intend to *hit* the victim." (*People* v. *Corlett, supra,* 67 Cal.App.2d 33, 54-55.) (See also *People* v. *Vasquez* (1927) 85 Cal.App. 575 [259 P. 1005].)

The first clear signs of doubt that an assault with a deadly weapon was not a specific intent crime are found in *People* v. *Carmen* (1951) 36 Cal.2d

*Sanchez* (1950) 35 Cal.2d 522, 526-528 [219 P.2d 9]; *People* v. *Price* (1908) 9 Cal. App. 218, 221 [98 P. 547]; *People* v. *Stephens* (1916) 29 Cal.App. 616, 622 [157 P. 570, 572] (opinion of Supreme Court appended in denying petition for hearing); *People* v. *Mendez* (1924) 67 Cal.App. 724 [228 P. 349]; *People* v. *Lopez* (1927) 81 Cal.App. 199 [253 P. 169]; *People* v. *Lim Dum Dong* (1938) 26 Cal.App.2d 135 [78 P.2d 1026]; *People* v. *Bumbaugh* (1941) 48 Cal.App.2d 791, 796 [120 P.2d 703]; *People* v. *Schmidt* (1944) 66 Cal.App.2d 253, 256 [152 P.2d 1021]; *People* v. *Peak* (1944) 66 Cal.App.2d 894, 901 [153 P.2d 464]; *People* v. *Corlett* (1944) 67 Cal. App.2d 33, 54-55 [153 P.2d 595, 964]; *People* v. *Duncan* (1945) 72 Cal.App.2d 423 [164 P.2d 510]; *People* v. *Griffin* (1949) 90 Cal.App.2d 116, 120-121 [202 P.2d 573]; *People* v. *Ingram* (1949) 91 Cal.App.2d 912, 914 [206 P.2d 36]; *People* v. *Thompson* (1949) 93 Cal.App.2d 780 [209 P.2d 819]; *People* v. *Walker* (1950) 99 Cal.App.2d 238, 242 [221 P.2d 287]; *People* v. *Laya* (1954) 123 Cal. App.2d 7, 15 [266 P.2d 157]; *People* v. *Swansboro* (1962) 200 Cal.App.2d 831, 837 [19 Cal.Rptr. 527]; *People* v. *Finley* (1963) 219 Cal.App.2d 330, 340 [33 Cal.Rptr. 31]; *People* v. *Herd* (1963) 220 Cal.App.2d 847, 850 [34 Cal.Rptr. 41]; *People* v. *Sandoval* (1963) 222 Cal.App.2d 348, 351 [35 Cal.Rptr. 227]; *People* v. *Claborn* (1964) 224 Cal.App.2d 38, 42 [36 Cal.Rptr. 132]; *Newman* v. *Larson* (1964) 225 Cal.App.2d 22, 24 [36 Cal.Rptr. 883]; *People* v. *Gaines* (1966) 247 Cal.App.2d 141, 148 [55 Cal.Rptr. 283]; *People* v. *Wright* (1968) 258 Cal.App.2d 762, 766-767 [66 Cal.Rptr. 95]; *People* v. *Morrow* (1969) 268 Cal.App.2d 939, 949-954 [74 Cal.Rptr. 551]. See 4 Am.Jur., Assault and Battery, § 6, p. 130; 6 Am.Jur.2d, Assault and Battery, §§ 13-20, pp 21-24; Fricke, Cal. Criminal Law (8th ed.) p. 186; 1 Witkin, Cal. Crimes (1963) pp. 249-250. But, as to the presence of some confusion, compare 3 Cal.Jur., Assault and Battery, § 14, pp. 197-198 with *id.,* § 19, p. 203; and see 5 Cal.Jur.2d, Assault and Battery, § 4, pp. 304-307; 92 A.L.R.2d 635. At least one early case implies that assault requires the specific intent to injure. *People* v. *Dodel* (1888) 77 Cal. 293, 294 [19 P. 484].

768 [228 P.2d 281]. The defendant was convicted of first degree murder and assault with intent to murder. As to the murder charge, he contended that he stumbled as he approached the car in which his victim was sitting and that the gun was discharged accidentally. The trial court refused to give an instruction on manslaughter, although requested to do so by both parties. In reversing the murder conviction, this court stated (p. 775):

"If the act committed by defendant was unlawful but did not amount to a felony then his crime would be manslaughter. The unlawful act would fall short of assault with a deadly weapon (Pen. Code, § 245), or even assault (Pen. Code, § 240), if the jury chose to believe his testimony that he had no intent to kill or injure anyone. This follows from the definition of an assault as 'an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' (Pen. Code, § 240.) One could not very well 'attempt' or try to 'commit' an injury on the person of another if he had no intent to cause any injury to such other person. Assault with a deadly weapon is nothing more than an assault where there is used either a deadly weapon or any means of force likely to produce 'great' bodily injury. (Pen. Code, § 245.) The crime here involved, if defendant's testimony is accepted as true, would seem to be a misdemeanor. 'Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, or any other deadly weapon whatsoever, in a rude, angry or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor.' (Pen. Code, § 417.)"

The opinion then expressly disapproved the cases that had held reckless conduct to be a sufficient basis for assault. (*People* v. *Peak, supra,* 66 Cal.App.2d 894; *People* v. *Corlett, supra,* 67 Cal.App.2d 33; *People* v. *Rumbaugh, supra,* 48 Cal.App.2d 791.)

*Carmen* was followed in *People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820]. Subsequently, in *People* v. *Coffey* (1967) 67 Cal.2d 204, 221-222 [60 Cal.Rptr. 457, 430 P.2d 15], we said, "[D]efendant testified at trial that he had no intention of harming or killing anyone and that he at no time aimed his gunshots at any person identifiable by him as such. It would seem clear that if defendant's testimony on this point were believed by the jury, it could not properly find violations of section 217 or section 245, subdivision (b), of the Penal Code, for basic to the indicated varieties of aggravated assault is the crime of simple assault. 'An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' (Pen. Code, § 240.) 'One could not very well "attempt" or try to "commit" an injury on the person of another if he had no intent to cause any injury to such other person. . . .' (*People* v.

*Carmen* [citation omitted].) Even if the jury had been instructed as to section 834a of the Penal Code, it is clear that a breach of the duty of submission [to arrest] imposed by that section, absent any intent to cause injury to a police officer, could not result in aggravated assault of the varieties here charged."

It should be noted that the opinion in *Coffey* did not use the words "specific intent," and that the opinion in *Carmen,* after the language quoted above, continued with the statement (p. 776): "It is true that in assault cases intent need not be specific—to cause any particular injury and it may be implied from the act (*People v. McCoy,* 25 Cal.2d 177 [153 P.2d 315]), but the intent is a question for the jury."

*Carmen, Wilson,* and *Coffey* have given rise to directly conflicting opinions in the Courts of Appeal. In *People v. Fanning* (1968) 265 Cal.App.2d 729, 734 [71 Cal.Rptr. 641], the court declared, "In spite of occasional statements to the contrary . . . , we think it now settled that assault is a specific intent crime. . . ." (Citing *People v. Carmen, People v. Coffey,* and *People v. Wilson, supra; People v. Wheeler* (1968) 260 Cal.App.2d 522, 525, fn. 4 [67 Cal.Rptr. 246]; *People v. Corson* (1963) 221 Cal.App.2d 579, 581 [34 Cal.Rptr. 584]. See also, *People v. Roshid* (1961) 191 Cal.App.2d 692, 693-694 [12 Cal.Rptr. 794].) On the other hand, *People v. Morrow, supra,* 268 Cal.App.2d 939, 953, expressly rejected the *Fanning* conclusion and held that assault with a deadly weapon "does not require proof of a specific intent to harm the victim but relies upon the general rule that what was done by [defendant] shows that harm was intended by the aggravated assault." The *Morrow* court reviewed many of the earlier cases and decided that such an overwhelming line of authority could not be considered overruled merely by implication from *Carmen, Wilson,* and *Coffey.*

The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender. That problem is to reconcile two competing theories of what is just in the treatment of those who commit crimes while intoxicated. On the one hand, the moral culpability of a drunken criminal is frequently less than that of a sober person effecting a like injury. On the other hand, it is commonly felt that a person who voluntarily gets drunk and while in that state commits a crime should not escape the consequences. (See Hall, General Principles of Criminal Law (2d ed. 1960), p. 537.)

Before the nineteenth century, the common law refused to give any effect to the fact that an accused committed a crime while intoxicated. The judges were apparently troubled by this rigid traditional rule, however, for there were a number of attempts during the early part of the nineteenth century

to arrive at a more humane, yet workable, doctrine.[5] The theory that these judges explored was that evidence of intoxication could be considered to negate intent, whenever intent was an element of the crime charged. As Professor Hall notes, however, such an exculpatory doctrine could eventually have undermined the traditional rule entirely, since some form of *mens rea* is a requisite of all but strict liability offenses. (Hall, *Intoxication and Criminal Responsibility,* 57 Harv.L.Rev. 1045, 1049.) To limit the operation of the doctrine and achieve a compromise between the conflicting feelings of sympathy and reprobation for the intoxicated offender, later courts both in England and this country drew a distinction between so-called specific intent and general intent crimes.

Specific and general intent have been notoriously difficult terms to define and apply, and a number of text writers recommend that they be abandoned altogether. (Hall, General Principles of Criminal Law, *supra,* p. 142; Williams, Criminal Law—The General Part (2d ed. 1961) § 21, p. 49.) Too often the characterization of a particular crime as one of specific or general intent is determined solely by the presence or absence of words describing psychological phenomena—"intent" or "malice," for example— in the statutory language defining the crime. When the definition of a crime consists of only the description of a particular act, without reference to

---

[5]In 1819 Holroyd, J., held in a murder case that, while voluntary drunkenness could not be an excuse, it should be considered in determining the issue of premeditation. (*Rex* v. *Grindley,* quoted in *Rex* v. *Carroll* (1835) 7 C. & P. 145, 173 Eng. Rep. 64.) In *Regina* v. *Cruse* (1838) 8 C. & P. 541, 173 Eng. Rep. 610, a case of assault with intent to murder, the court instructed the jury that gross intoxication might disprove the intention required for the aggravated offense. With respect to a similar charge in *Regina* v. *Monkhouse* (1849) 4 Cox C. C. 55, Coleridge, J., said that the burden was on the accused to show that his intoxication prevented him from using self-restraint or took away from him "the power of forming any specific intention." This opinion was apparently the first to use the words "specific intention."

"As if by accident, the 'specific intention' was seized upon as the important criterion. Yet the wording of Coleridge, J.'s summing-up shows that he did not mean to weave any particular magic with these words. This is obvious when he directs the jury in *Monkhouse* to make a proper assessment of both act and mind: 'To ascertain whether or not [the lack of power to form any specific intention] did exist in this instance, you must take into consideration the quantity of spirit he had taken, as well as his *specific conduct.*' Surely the adjective 'specific' simply means that the accused's actions, mental processes and motives, that is, all the circumstances of the case, should be evaluated by the jury and viewed subjectively." (Beck and Parker, *The Intoxicated Offender—A Problem of Responsibility,* 44 Can.BarRev. 563, 578.) Subsequent English cases of the nineteenth century did not stress Coleridge's phrase, but explored the general thesis that intoxication was relevant to the issue of intent. Thus, in *Regina* v. *Bentley* (1850) 14 J.P. 671, the court stated that "the question of drunkenness is a fact which, among others, the jury may take into consideration in endeavouring to ascertain the intent." In a form more akin to the present rule (Pen. Code, § 22), Stephen, J., told the jury in *R.* v. *Doherty* (1887) 16 Cox. C.C. 463, "when the crime is such that the intention of the party committing it is one of its constitutent elements you may look at the fact that a man was in drink in considering whether he formed the intention necessary to constitute the crime."

intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent. There is no real difference, however, only a linguistic one, between an intent to do an act already performed and an intent to do that same act in the future.

The language of Penal Code section 22, drafted in 1872 when "specific" and "general" intent were not yet terms of art, is somewhat broader than those terms: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." Even this statement of the relevant policy is no easier to apply to particular crimes. We are still confronted with the difficulty of characterizing the mental element of a given crime as a particular purpose, motive, or intent necessary to constitute the offense, or as something less than that to which evidence of intoxication is not pertinent.

Even if we assume that the presence or absence of words clearly denoting mental activity is a valid criterion for determining the significance of intoxication, our present problem is not resolved. The difficulty with applying such a test to the crime of assault or assault with a deadly weapon is that no word in the relevant code provisions unambiguously denotes a particular mental element, yet the word "attempt" in Penal Code section 240 strongly suggests goal-directed, intentional behavior.[6] This uncertainty accounts for the conflict over whether assault is a crime only of intention or also of recklessness.

We need not reconsider our position in *Carmen* that an assault cannot be predicated merely on reckless conduct. Even if assault requires an intent to commit a battery on the victim, it does not follow that the crime is one in which evidence of intoxication ought to be considered in determining whether the defendant had that intent. It is true that in most cases specific intent has come to mean an intention to do a future act or achieve a particular result, and that assault is appropriately characterized as a specific intent crime under this definition. An assault, however, is equally well

---

[6]Penal Code, section 240 provides: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

It was the strong suggestion of intent in the ordinary usage of the word "attempt" that was at the basis of this court's remark in *People* v. *Carmen,* 36 Cal.2d 768, 775 [228 P.2d 281], that "[o]ne could not very well 'attempt' or try to 'commit' an injury on the person of another if he had no intent to cause any injury to such other person."

characterized as a general intent crime under the definition of general intent as an intent merely to do a violent act. Therefore, whatever reality the distinction between specific and general intent may have in other contexts, the difference is chimerical in the case of assault with a deadly weapon or simple assault. Since the definitions of both specific intent and general intent cover the requisite intent to commit a battery, the decision whether or not to give effect to evidence of intoxication must rest on other considerations.

A compelling consideration is the effect of alcohol on human behavior. A significant effect of alcohol is to distort judgment and relax the controls on aggressive and anti-social impulses. (Beck and Parker, *The Intoxicated Offender—A Problem of Responsibility* (1966), 44 Can. Bar Rev. 563, 570-573; Muelberger, *Medico-Legal Aspects of Alcohol Intoxication* (1956), 35 Mich. State Bar J. 36, 40-41.) Alcohol apparently has less effect on the ability to engage in simple goal-directed behavior, although it may impair the efficiency of that behavior. In other words, a drunk man is capable of forming an intent to do something simple, such as strike another, unless he is so drunk that he has reached the stage of unconsciousness. What he is not as capable as a sober man of doing is exercising judgment about the social consequences of his acts or controlling his impulses toward anti-social acts. He is more likely to act rashly and impulsively and to be susceptible to passion and anger. It would therefore be anomalous to allow evidence of intoxication to relieve a man of responsibility for the crimes of assault with a deadly weapon or simple assault, which are so frequently committed in just such a manner. ▆▆▆ As the court said in *Parker* v. *United States* (D.C. Cir. 1966) 359 F.2d 1009, 1012-1013, "Whatever ambiguities there may be in distinguishing between specific and general intent to determine whether drunkenness constitutes a defense, an offense of this nature is not one which requires an intent that is susceptible to negation through a showing of voluntary intoxication."

Those crimes that have traditionally been characterized as crimes of specific intent are not affected by our holding here. The difference in mental activity between formulating an intent to commit a battery and formulating an intent to commit a battery for the purpose of raping or killing may be slight, but it is sufficient to justify drawing a line between them and considering evidence of intoxication in the one case and disregarding it in the other.[7] Accordingly, on retrial the court should not instruct the jury

---

[7]It should be pointed out that the fact that intent may be inferred from the defendant's conduct does not affect the nature of the requisite intent. Whether the intent be merely to do that which was done or to do a further act or achieve a particular consequence, the jury may infer from defendant's acts that defendant acted with the requisite intent, if such an inference is warranted by the evidence. As the Court of Appeal said in *People* v. *Fanning, supra,* 265 Cal.App.2d 729, 734, fn. 4, in discussing whether assault was a specific or a general intent crime, "The confusion seems to be,

to consider evidence of defendant's intoxication in determining whether he committed assault with a deadly weapon on a peace officer or any of the lesser assaults included therein. *People* v. *Fanning, supra,* 265 Cal.App.2d 729, and any case implying the contrary are disapproved.

■ To preclude double punishment for a single assault (Pen. Code, § 654), the trial court stayed execution of the sentence on count I, which carries a maximum penalty of 15 years (Pen. Code, § 245, subd. (b)), and ordered that defendant serve the sentence on count III, which carries a maximum penalty of 14 years (Pen. Code, § 217). Accordingly, had defendant not appealed, his maximum term would have been 14 years. To preclude penalizing him for appealing, the court may not impose a maximum sentence of more than 14 years if on retrial he is again found guilty on count I or count III or both. (*People* v. *Henderson* (1963) 60 Cal.2d 482, 495-497 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Ali* (1967) 66 Cal.2d 277, 281-282 [57 Cal.Rptr. 348, 424 P.2d 932]; *In re Ferguson* (1965) 233 Cal.App.2d 79, 81-82 [443 Cal.Rptr. 325].)

The judgment is reversed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

in part at least, traceable to the rule that the intent may be inferred from the act. (*People* v. *McCoy,* 25 Cal.2d 177, 194-195 [153 P.2d 315].) The fact that one element of a crime may be inferred from proof of another does not decrease the number of elements." In the crimes of simple assault and assault with a deadly weapon, the jury may infer from defendant's conduct that he entertained the necessary intent to commit an injury. Such an inference does not affect the nature of that intent or determine what significance should be accorded to evidence of intoxication.