[No. C009819. Third Dist. Jan. 17, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EUGENE FABRIS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*See footnote 2, *post*, page 688.

**COUNSEL**

Bradley A. Bristow, under appointment by the Court of Appeal, and Thomas W. Condit for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael Weinberger and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—A jury convicted the defendant of one count of arson of an inhabited structure (Pen. Code, § 451, subd. (b))[1] and one count of presentation of a fraudulent insurance claim (former Ins. Code, § 556, subd. (a)(1) [Stats. 1988, ch. 1609, § 1, p. 5864].) The court suspended the imposition of sentence and placed the defendant on probation for five years on condition he pay restitution in the amount of $53,000 and serve a one-year jail term.

In the published portion of the opinion[2] we reject defendant's argument, predicated upon *In re Stonewall F.* (1989) 208 Cal.App.3d 1054 [256 Cal.Rptr. 578], that the trial court prejudicially erred in instructing the jury that arson requires a general criminal intent.

In *Stonewall F.* we held that arson, as it is defined in section 451, requires an intent to set fire to or burn or cause to be burned a structure, forest land or specified property. That definition was given in this case as part of CALJIC No. 14.80. We adhere to *Stonewall F.* and conclude that the jury was properly instructed and that an instruction on general intent, also given the jury, is consistent with the instruction as given.

Accordingly, after modifying the order of probation to include conduct credits arising from defendant's jail term, we will affirm the judgment.

### FACTS AND PROCEDURAL BACKGROUND

A six-man canal-cleaning crew employed by the Nevada Irrigation District (NID) was working on irrigation canals in the Rough and Ready section of Nevada County on February 28, 1989. The canal on which they were working ran past the defendant's home on Haveture Way. While working approximately 75 feet up the canal, the crew members saw nothing out of the ordinary about defendant's house. Most of the crew then circled around by truck toward a part of the ditch by the defendant's house, while another crew member walked the direct route down the ditch to meet them. The NID truck passed the defendant on its way; he was headed in the opposite direction, away from his home. They arrived at the defendant's house no more than 15 minutes after leaving their initial vantage point. Smoke was coming from the eves and windows. The worker walking down the ditch began smelling smoke a couple of minutes before he reached the house.

---

[1]References to a section are to the Penal Code unless otherwise specified.

[2]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II through V of the Discussion.

The supervisor of the NID crew attempted to open the main door of the house. It was fully closed and—according to the supervisor—locked. A crew member testified it was shut tighter than if it had just been closed by the wind. One of the crew members first tried breaking down the door with an ax; when that failed, he kicked the door in. It fell off its hinges. The supervisor could not recall seeing a separate deadbolt mechanism, but the worker who had broken down the door testified he noticed either that day or the next that the deadbolt had been extended; one of his coworkers concurred in his observation. There was quite a bit of smoke inside, and flames were coming down the wall to the left between the door and a washer and dryer.

While they awaited the arrival of the volunteer fire department (whom they had summoned by radio), one of the workers clambered up to the second-story deck and pushed open a sliding glass door with his ax handle. Black smoke billowed out. By this time the defendant had returned (about five minutes before the fire department arrived and ten minutes after the crew had gotten there). Climbing up onto the deck, he warned the worker to stay away from the house because there was ammunition inside. After the fire had grown in intensity and the fire department had begun its suppression efforts, the defendant told one of the NID workers that the fire might have been started by his neighbor's goats, who could have gotten into the house and chewed through an electrical wire or knocked over a jerrican, the contents of which would then have been ignited by the washer or dryer—which he had left operating while he ran his errands. No one had heard anything at this point about goats being found in the house, but there were two young goats bleating loudly at the fence.

One of the firefighters found a jerrican under the stairs leading to the second floor (which were to the right of the front door). It was still about one-quarter full of gas. He removed it from the house, but returned it to its exact location before the fire marshal's investigation. Another firefighter entered the building and saw that the flames had burned through the ceiling of the entryway; he could see all the way through to the second-floor ceiling, which was also aflame. Upstairs, he had particular difficulty extinguishing flames in the kitchen near the sliding glass door (which was directly above the entranceway). In his experience, this was consistent with a flammable liquid being involved in the fire. He stumbled across the bodies of two animals later determined to be goats. After the fire was suppressed, the fire chief came over to the defendant and his neighbor, who owned the goats, to inform them of the grisly discovery.

The defendant repeated his theory involving the goats to a number of people. When the fire chief told him about finding the goats, the defendant

said the goats would push their way through the door, and the chief and the defendant discussed whether the goats could have knocked over the gas can and whether the dryer could have ignited the fumes. The night of the fire, the defendant called the intended purchasers of his house to tell them to take it out of escrow because it had burned down. He asked if they remembered how the goats would push open the door and get into the house, but the buyers had no such recollection. He told his insurance agent the next day about the fire and his speculation that the goats—which knew how to push open his door—had knocked over a can of gas he had in the house, which was then ignited by the dryer he had left running while he was out of the house taking care of some errands. He also repeated this for the insurance adjuster (whom he told the goats had previously gotten into the house the week before), the claims representative (whom he told he must have left the door ajar), and the state fire marshall's investigator (whom he told he had trouble with the door closing, so he left it ajar when he went to run his errands).

A number of witnesses testified to the condition of the front door before the fire. The neighbor who had owned the goats and known defendant for 10 years said the deadbolt was broken and the door would stick tight if closed all the way, so it was generally left unlocked.[3] The irate intended buyers of the house (who had become incensed when defendant told them he would not use the insurance money to rebuild the house) testified they never had any difficulty in closing the door, but it would stick when one tried to open it. The realtor who listed the defendant's house said the door was never locked. Another longtime friend of the defendant testified that whenever he came to visit the defendant, he would just push open the door. He had never found it locked.

There was additional circumstantial evidence of the defendant's guilt. According to the intended buyer of the house, the defendant had told him on a number of occasions before February 1989 that he wished he had burned the house down during the 49er fire (a large conflagration in September 1988 which had damaged only defendant's landscaping while destroying his neighbor's home) because no one would have questioned the cause; the defendant would always hasten to tell the buyer he was too honest to do any such thing. The defendant also told the intended buyer he was unhappy with the price because he needed to get more cash out of the sale. The insurance agent testified the defendant had brought up the 49er fire with him as well; the defendant told him it was a shame the fire had not occurred back then because it would have saved the agent time and effort. The county tax

---

[3]This witness testified the goats would follow him around anywhere (since they were pets), including into the house, but he had never seen the goats go into the defendant's house.

assessor testified the defendant was two years behind in paying his property taxes.

The defendant testified at trial. He reiterated the theory about the goats, and maintained he had not firmly closed the door because of the difficulty in reopening it. He asserted he had adequate financial resources at the time of the fire. He admitted he had underrepresented his assets in a spousal support hearing shortly before the fire at which he was seeking increased support from his ex-wife. At the hearing he claimed he was destitute. He also admitted he had given an extremely low value ($200) for his household goods in a bankruptcy proceeding, saying he did so on advice of counsel.

Two experts testified for the prosecution, one of whom was an investigator for the state fire marshal and one of whom was a private investigator retained by the insurer. They had made their investigation in parallel a week after the blaze. Both believed there were two sources of incendiary fire—one under the stairs, and one in the kitchen—although neither was able to say which was ignited first, or if one ignited the other. The fire in the kitchen burned down through the floor. Neither expert found any indication the fire could have been started by the washer or dryer. It is sufficient to note the experts based their opinion on their interpretation of physical evidence in the remains of the house and the firefighter's description of his difficulty extinguishing the upstairs fire. A chemist with the state fire marshal testified he found flammable liquids present in samples taken from the debris left upstairs and downstairs.

Two experts also testified for the defendant. One was a state fire marshal investigator who examined the site in March 1990. He believed the fire had started on the floor in the entryway, which then burned its way upstairs. If there had been flammable liquids upstairs to accelerate the rate of burn, the fire would have flared up when the NID worker slid open the outside door to the kitchen. He could not, however, eliminate the possibility that the fire had been deliberately ignited on the first floor, and he conceded there was evidence consistent with flammable liquid having been poured over the kitchen floor.

The defendant's main expert was a retired investigator from the state fire marshal's office who was now working privately. He examined the fire scene in November 1989. He believed the fire had originated downstairs on the entryway floor and burned its way up; he did not think there was any evidence that there had been flammable liquids poured in the kitchen, particularly since there was no flare-up when the NID worker slid open the kitchen door. Until the night before trial, he was at a loss for a source of

ignition. Rereading the materials, he had a flash of inspiration when he remembered the dryer; he believed the dryer's heating coils had caused the gasoline vapors to inflame. He did not recall the firefighter's description of the second-floor fire, but offered the opinion it could be explained by the ventilation provided by the kitchen door. He admitted his initial conclusion had been that the theory about the goats was inconsistent with flammable liquids having been found near the upstairs fireplace. However, he ultimately concluded the reports of the initial investigators were inconclusive on this point, so he abandoned this position in a supplemental report in favor of a belief in an accidental cause.

At the outset of its instructions the trial court defined "willfully" and "maliciously" as follows.

"The word 'willfully', when applied to the intent with which an act is done or omitted means [with] a purpose or willingness to commit the act or to make the omission in question. The word 'willfully' does not require any intent to violate the law, or to injure another, or to acquire any advantage.

"The words 'malice' and 'maliciously' mean a wish to vex, defraud, annoy or injure another person, or an intent to do a unlawful act." (CALJIC Nos. 1.20, 1.22.)

The trial court instructed the jury that arson of an inhabited structure requires: "[A] joint operation of act or conduct and general criminal intent. To constitute general criminal intent, it is not necessary that there should exist an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful." (CALJIC No. 3.30.)

The trial court then defined the required mental state, in the language of CALJIC No. 14.80, as follows:

"1. A person set fire to or burned or caused to be burned, or aided, counseled or procured the burning of a structure or property,

"2. The fire was willfully and maliciously set;

"3. The fire caused an inhabited structure or property to burn."

"The words 'willfully and maliciously' as used in this instruction mean[] an intent to set fire to or burn or cause to be burned, any structure, forest land or property."

## DISCUSSION

### I

The defendant, citing to *Stonewall F., supra*, 208 Cal.App.3d 1054, claims that the crime of arson requires a specific intent and that the trial court prejudicially erred in giving both general and specific intent instructions.

He identifies the specific intent instruction as CALJIC No. 14.80 (1993 rev.), modified pursuant to *Stonewall F.* He identifies the general intent instructions as CALJIC Nos. 1.20 and 1.22, which set out the statutory definitions of "willfully" (§ 7, subd. 1) and "maliciously" (§ 450, subd. (e)), as they are employed in the definition of arson in section 451, and CALJIC No. 3.30 which says that arson requires a general criminal intent.

The defendant acknowledges that CALJIC No. 14.80, as given, is in accord with *Stonewall F.*, but contends that, in the light of the so-called general intent instructions, the jury was confused to his prejudice.

The Attorney General replies that *Stonewall F.* did not "convert[] arson (Pen. Code, § 451) into a specific intent crime." The Attorney General is correct.

### A.

#### *The Scienter Required for Arson Is Correctly Stated in Stonewall F.*

In *Stonewall F., supra*, we analyzed at length the scienter prescribed by section 451 for the crime of arson. We held, applying the language of the statute, that arson, as defined in the first paragraph, requires an intent to set fire to or burn or cause to be burned a structure, forest or specified property. (208 Cal.App.3d at p. 1065.) We concluded that this definition requires an intent to burn a structure when the burning is caused by the act of setting fire to a substance which is not itself the subject of the arson statute.

The opinion is criticized in *People v. Glover* (1991) 233 Cal.App.3d 1476 [285 Cal.Rptr. 362], *People v. Lopez* (1993) 13 Cal.App.4th 1840, 1844-1846 [17 Cal.Rptr.2d 317], and *People v. Fry* (1993) 19 Cal.App.4th 1334, 1338-1339 [24 Cal.Rptr.2d 43], as departing from precedent in holding that arson is a specific intent crime. The criticism is misinformed.[4] *Stonewall F., supra*, does not characterize arson as a specific intent crime and expressly eschews resolution of the issue. (See 208 Cal.App.3d at p. 1064, fn. 8.)

---

[4]The opposition to *Stonewall F.* is refractory because it rests on unexamined and mistaken assumptions. "We must begin with the mistake and transform it into what is true. [¶] That is,

In *Stonewall F.* two minors had set fire to leaves near a schoolhouse which caused the structure to partially burn. The trial court found that, although the minors did *not* intend to set fire to the schoolhouse, they were reckless in causing the fire. Nonetheless, the court concluded that they had committed arson. Since setting fire to the leaves does not alone constitute arson (§ 451, subd. (d)), the trial court's finding extended arson to the reckless and *un*intended consequences of setting fire to a substance which is not itself the subject of the arson statute. This finding required that we determine the correct scienter.[5]

To that end we looked to the definition of arson as set out in the first paragraph of section 451. It says that "[a] person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned . . . any structure, forest land, or property."[6] We reasoned, applying the statutory definition of "willfully" (§ 7, subd. 1) as "the *intent* with which an *act* is done," that we could "complete the syntax of the definition by substitution of the language of the wrongful act, such that arson requires 'an intent to' 'set[] fire to or burn[] or cause[] to be burned, any structure . . . .' " (*In re Stonewall F., supra,* 208 Cal.App.3d at p. 1065, citation omitted, italics added.) "By so parsing the language, the end in view of the arson statute is revealed as the accomplishment of the acts condemned, e.g., the burning of a defined structure . . . ." (*Ibid.*)

The "acts" to which the intent supplied by "willfully" applies in the statutory definition are the acts of: (1) setting fire to or (2) burning or (3) causing to be burned a structure. The "acts" referred to in (1) and (2) are

we must uncover the source of the error; otherwise hearing what is true won't help us. It cannot penetrate when something is taking its place. [¶] To convince someone of what is true, it is not enough to state it; we must find the *road* from error to truth." (Wittgenstein, Remarks on Frazer's Golden Bough (Rhees ed. 1979) p. 1e.)

[5]In light of the fact that *Stonewall F.* never addressed the question of scienter in terms of specific or general intent it is odd that *People* v. *Lopez, supra,* characterizes "any discussion" of those terms as "an archetypical example of dicta." (13 Cal.App.4th at p. 1845, fn. omitted.) Given that the mental state required for arson was squarely posed under the unusual facts of *Stonewall F.,* the implicit aspersion to dicta is ironic.

[6]This definition establishes the scienter required for all of the arson offenses, including the aggravated offenses of "[a]rson that causes" bodily injury (§ 451, subd. (a)) and "[a]rson that causes" an inhabited structure to burn (§ 451, subd. (b)). The additional penalties accrue to the specified causal effects of the arson regardless whether they were intended.

A simple arson—one that satisfies the definition of arson in the first paragraph of section 451—is punishable by two, four or six years. (§ 451, subd. (c).) By contrast, an arson *"that causes* great bodily injury" is punishable by five, seven, or nine years. (§ 451, subd. (a), italics added.) An arson *"that causes* an inhabited structure . . . to burn" is punishable by three, five, or eight years. (§ 451, subd. (b), italics added.)

In each case, there must be an arson, i.e., an offense meeting the definition of an arson in the first sentence of section 451. For the aggravated penalties to apply such an arson must have the specified causal consequence.

unproblematic; they are the acts of directly setting fire to the structure. The intent required is perforce an intent to do that, i.e., an intent that the structure burn.

The "act" referred to in (3) is of a different grammatical order. It is the act of *causing* a structure to burn. It is *not* an act *"that* causes" the structure to burn as the statute makes clear in assessing aggravated penalties.[7] In ordinary language *to intend to cause* an event is to intend the event. Thus, to intend to cause a structure to burn is to intend that the structure burn whatever the act that initiated the fire. This reading is consistent with the intent required of (1) and (2), that a structure burn; all three require the same scienter.

This is the only plausible reading of section 451. If, contrary to its language, the section is read so that the intent supplied by the term "willfully" applies to the act *"that causes"* a structure to burn, i.e., the act which *initiates* the chain of causation leading to the burning of a structure, it would be arson if a person intended the act without intending the causal result. This reading is wholly untenable. It would reduce arson to a species of malicious risk-taking, something less culpable than reckless conduct. It would then constitute arson if a person maliciously[8] set fire to leaves in his or her backyard and the fire *accidentally* spread to a structure within the ambit of the arson law.

This consequence is ruled out because it would make this form of arson less culpable even than the lesser offense of unlawful burning, which requires reckless conduct. In creating the distinct offenses of arson (§ 451) and unlawful burning (§ 452), distinguished by their mental states (intention v. recklessness) and higher arson penalties, the Legislature graded arson as the more culpable offense. (Cf. *People* v. *Spann* (1986) 187 Cal.App.3d 400 [232 Cal.Rptr. 31].) "The manifest inference to be drawn from the fact that the offense of unlawfully causing a fire employs the culpability standard of recklessness [§ 452] is that the offenses listed in section 451 require a culpability standard transcending recklessness. Since recklessness . . . entails the subjective appreciation . . . of a substantial and unjustifiable risk amounting to a gross deviation from the reasonable standard of conduct, the only candidate for higher culpability is the culpability standard we call intentional." (*In re Stonewall F., supra,* 208 Cal.App.3d at p. 1067.)

---

[7]By contrast, section 451 increases the penalties for an "[a]rson *that causes*" bodily injury or an inhabited structure to burn (§ 451, subds. (a) and (b)), plainly showing that the Legislature knows how to specify the unintended causal consequence of a predicate act. (See fn. 6, *ante.*)

[8]Section 451 requires that the proscribed act be done both "willfully and maliciously," i.e., both intentionally and with a "wish to vex, defraud, annoy, or injure another person, or an intent to do a wrongful act . . . ." (§ 450, subd. (e).)

Notably lacking in *Glover, Lopez,* and *Fry* is *any* response to *Stonewall F.*'s statutory analysis. *Glover,* for example, having categorized arson as a general intent crime, simply rejects the view that arson requires "a specific intent to set fire to the structure." (233 Cal.App.3d at p. 1479.) It does not say what, if anything, must be intended, what the terms "willfully" and "maliciously" mean as used in the definition of arson, or in what way arson differs from the companion offense of unlawful burning. *Glover* appears to reason from the general intent category, into which it places arson, to the scienter required by the offense without consideration of the statutory definition of arson.

*Glover* says that it relies upon the criteria of specific and general criminal intent set forth in *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370], but it does not apply them either to the statutory definition in section 451 or to the facts of the case before it. (*People* v. *Glover, supra,* 233 Cal.App.3d at p. 1483.)[9]

*Hood* defines the terms specific and general intent as follows:[10] "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition

---

[9]The facts reveal *Glover* as a typical arson case in that the prospect that the defendant did the act in question but lacked the requisite intention to cause a structure to burn is utterly sophistic. The defendant hired one Dukes to "start a fire with kerosene in her apartment." (233 Cal.App.3d at p. 1479.) He poured kerosene over furniture inside the house and "all over the floor" (*ibid.*) and set fire to it. In so doing an arson was committed by the intentional act of *directly* setting fire to the apartment. Since arson encompasses the *partial* burning of a structure, the offense was complete when Dukes intentionally burned a *part* of the apartment. (§ 451, first par.; see *In re Stonewall F., supra,* 208 Cal.App.3d at p. 1063.) The defendant could not plausibly maintain that the gasoline was poured over the floor of her apartment without the intent to set fire to it.

[10]It is important to note that *Hood* involves the admissibility of evidence of voluntary intoxication pursuant to section 22. "The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender." (1 Cal.3d at p. 455.)

Section 22 provides for the admissibility of evidence of voluntary intoxication only when the offense is a "specific intent crime." However, as *Hood* is careful to point out, the criteria of specific intent for this purpose are not necessarily the same as the criteria of specific intent as a measure of the scienter required for an offense. That can be seen in *People* v. *Whitfield* (1994) 7 Cal.4th 437, 450-451 [27 Cal.Rptr.2d 858, 868 P.2d 272] which held that a homicide committed with *implied* malice is a "specific intent crime" for purposes of section 22, an offense that does not meet the *Hood* criteria of specific intent.

Here, as in *Stonewall F.,* we imply no view whether arson, as defined in section 451, is a "specific intent crime" for purposes of section 22. Voluntary intoxication is expressly addressed only in the unlawful burning statute. "A person who creates such a risk [that act will set fire to or cause a defined burning] but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto." (§ 450, subd. (f).)

refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (1 Cal.3d at pp. 456-457.)

As this passage says, the criteria of specific and general intent apply only to the statutory "definition of a crime . . . ." A crime is said to require a general intent if the statutory definition provides that the defendant intended to do a proscribed *act* without reference to an intent to do a further act or achieve a particular consequence. It is apparent that to determine the category into which to place the intended act, the proscribed *act* must first be determined by examination of the language of the statute defining the offense.

As explained above, arson, as defined in the first paragraph of section 451, requires an intent to do any of the *acts* of burning, setting fire to or causing to be burned a structure. There is no reference here to an intent to do a further act or achieve a consequence beyond the "acts" there defined. For this reason, applying the *Hood* criteria, arson can be categorized as a general intent crime.

Like *Glover*, *Lopez* makes no analysis of the statutory definition of arson nor does it apply the *Hood* criteria. There was no reason to do so. Although the defendant initiated the burning of his trailer by setting fire to clothing placed on top of a bed, he made no focused claim that the clothing was burned without the intention to cause the structure to burn. More importantly, the jury was properly instructed, as in this case, since the jury instructions "incorporat[ed] the *Stonewall F.* definition of 'willfully and maliciously . . . .' " (*People* v. *Lopez*, *supra*, 13 Cal.App.4th at p. 1845, fn. 3.)

*Fry* presents a different problem. The intoxicated defendant set fire to a car in a carport causing the carport to burn.[11] The defendant was found guilty of two arsons, one for the car and one for the carport. The trial court found that although the defendant did not intend to burn the carport, he was guilty of arson because its burning was the "natural and probable consequence of his conduct." (*People* v. *Fry*, *supra*, 19 Cal.App.4th at p. 1339.) The Court of Appeal agreed with the finding and upheld the conviction on the ground that ". . . it is undisputed that defendant's conduct actually and proximately *caused* the carport, i.e., the structure, to be burned; setting fire to the car created a substantial and unjustifiable risk that the carport would

---

[11]The facts in *Fry* raise the question, not presented here or in *Stonewall F.*, of the materiality of evidence of voluntary intoxication to arson. That puts the question of specific intent in a wholly different light. (See fn. 10, *ante*.)

burn . . . ." (*Ibid.*, original italics.) It distinguished *Stonewall F.* on the ground that it was less foreseeable that the school would burn as a result of the leaf fire than that the carport would burn as a result of burning the car.[12]

There are two manifest difficulties with this reasoning. First, the phrase "natural and probable consequence" does not appear in section 451. Second, applied as a measure of culpability, the phrase imports a negligence standard into the arson statute. A natural and probable consequence is a forseeable consequence. "A result cannot be the natural and probable cause of an act if the [result] was unforseeable." (*People* v. *Roberts* (1992) 2 Cal.4th 271, 321-322 [826 P.2d 274, 6 Cal.Rptr.2d 276].) If a person is deemed culpable for the forseeable consequences of his or her act we ordinarily call this negligence. "Liability for natural and probable consequences is regarded as legally equivalent to liability for reasonably foreseeable consequences, and is another way of expressing liability for negligence." (Williams, Criminal Law, The General Part (2d ed. 1961) § 35, p. 90.)

Negligence is not a measure of culpability under either the arson or unlawful burning statutes, which specify, respectively, intention and reck-lessness as the culpable states. Whether the result in *Fry* might be justified under the notion that the defendant knew that the carport burning was *substantially certain* to occur, a question of oblique or imputed intention, cannot be ascertained from the opinion. (See *In re Stonewall F.*, *supra*, 208 Cal.App.3d at p. 1062, fn. 7; see also Williams, *Oblique Intention* (1987) 46 Cambridge L.J. 417; 1 LaFave & Scott, Substantive Criminal Law (1986) § 3.5(f), p. 316.)[13]

But what, it must be asked, is the point of characterizing the intent required for arson as either specific or general? If the jury is correctly appraised of the elements of arson—that the intent required is to set fire to or cause a structure to burn—and there is no issue of voluntary intoxication, it is not necessary to say in the jargon of the law that we call this a general or a specific intent. (Cf. fn. 10, *ante*.) The addition of the terms general or

---

[12]*Fry* does not note that the causal distance was sufficiently short in *Stonewall F.* to warrant a finding of recklessness, which is made punishable under the less culpable offense of unlawful burning. Recklessness imposes a more stringent standard than negligence. (§ 452; *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279].)

[13]Nor could culpability for the arson of the car extend to culpability for the resultant burning of the carport on the theory the one caused the other. The arson and unlawful burning statutes specify when culpability extends to the consequences of an arson or unlawful burning. An aggravated penalty is attached when the consequence of the arson or unlawful burning is bodily injury or the burning of an inhabited dwelling. (See fn. 6, *ante*.)

specific to the intent required for arson would add nothing to the elements of the offense.[14]

■ *Stonewall F.* correctly analyzes the intent required for arson as it is defined in section 451. Since the jury in this case was instructed in accordance with the definition, the defendant is left with the claim that the jury was deflected from correctly applying the language of that instruction by the other instructions of which he complains.

## B.

### *The Jury Was Not Deflected From the Correct Definition of the Arson Offense by the Other Instructions*

■ The defendant's main argument is that the composite instructions concerning arson are prejudicially erroneous because they consist of a confusing mixture of general intent and specific intent instructions. Our answer is that in this case there was nothing confusing about the instructions.

The defendant argues that the terms "willfully" and "maliciously," as defined for the jury, are "general intent terms" and "do not connote a specific intent." He suggests that he might have been convicted under these instructions for leaving his home unlocked, with an open gasoline can, his appliances on, and knowledge of the intrusive propensity of his neighbor's goats, "not intending to set a fire, but hoping to vex or defraud his insurance carrier if his house did burn down." This hypothetical of contingent hope is ludicrous. Even if we were to indulge it, we discern no prospect for prejudice.

Defining "willfully" and "maliciously" in their statutory terms (respectively, § 7, subd. 1 and § 450, subd. (e)) for the purpose of their use in the definition of arson, could not deflect the jury from the correct definition of the intention required for arson. As noted earlier, in *Stonewall F., supra*, we substituted the definitions for these terms in the definition of arson, concluding thereby that arson requires an intent to do the act there condemned, i.e., an intent to set fire to or burn or cause to be burned a structure, forest or property. (208 Cal.App.3d at p. 1065.)

Nor could the jury have been deflected from an understanding of the correct intent by the addition of the generic general intent instruction. The instruction said: "In arson there must exist a union or joint operation of act or conduct and general criminal intent. . . . When a person intentionally

---

[14]As we have noted, a different problem arises under section 22. (See fn. 10, *ante.*)

does that which the law declares to be a crime, he is acting with a general criminal intent . . . ."

The application of this instruction to the acts condemned by the arson statute could not have caused juror confusion. "Since the general intent instruction is dependent upon 'that which the law declares to be a crime,' its effect turns upon the substantive elements of the offense to which it is applied." (*People* v. *Lyons* (1991) 235 Cal.App.3d 1456, 1462 [1 Cal.Rptr.2d 763]; see also *People* v. *Zerillo* (1950) 36 Cal.2d 222, 232 [223 P.2d 223].)

The jury was instructed on the substantive elements of arson, that it requires an intent to set fire to or burn or cause to be burned the defendant's house. Applying the general intent instruction as the intentional doing of that which section 451 declares to be a crime, the burning, setting fire to or causing to be burned a structure, results in precisely this instruction.

■ The defendant broaches one further claim, that the court erred by failing to instruct in the manner of CALJIC No. 2.02 on the sufficiency of circumstantial evidence to prove the specific intent required for arson. CALJIC Nos. 2.02 and 2.01 address circumstantial evidence. CALJIC No. 2.01, the more general instruction, informs the jury that each essential inference drawn from circumstantial evidence must rest on facts proven beyond a reasonable doubt and may only be drawn if that evidence is not susceptible of a reasonable interpretation pointing to defendant's innocence. CALJIC No. 2.02 conveys the same charge about such inferences concerning the mental state with which the wrongful act must be done.

The jury was instructed regarding the charge of insurance fraud (count II) in the manner of CALJIC No. 2.02 concerning the "specific intent with which an act is done . . . ." The defendant suggests this incorrectly and confusingly informed the jury that "none of the rules that limit, explain, or qualify the evidence necessary to prove specific intent apply to arson." The jury was not told that arson is a "specific intent" crime, nor was the use of that term required.

The jury was given a general instruction, CALJIC No. 2.01, on the sufficiency of circumstantial evidence required for conviction of "any crime" and "any particular count." Defendant does not explain and we see no reason why this instruction does not adequately set forth the test of circumstantial evidence for the arson offense. By its terms it applies to arson. Since the term "specific intent" was never applied to the arson offense, there is no basis for the defendant's claim that the limitation of the CALJIC No. 2.02 instruction to the insurance fraud count was misleading.

None of the defendant's claims of prejudice are persuasive. Since the jury was adequately instructed on the required intent, the defendant's contention of prejudicial misinstruction concerning the arson offense is not meritorious.

II-V*

. . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The order of probation is modified to include conduct credits of 50 days in addition to the credit of 100 days for actual custody. As so modified, the order is affirmed. The trial court shall prepare a corrected order in accordance with this opinion.[15] In all other respects the judgment is affirmed.

Sims, J., and Davis, J., concurred.

A petition for a rehearing was denied February 10, 1995, and appellant's petition for review by the Supreme Court was denied April 20, 1995. Kennard, J., and Arabian, J., were of the opinion that the petition should be granted.

---

*See footnote 2, *ante*, page 688.

[15]The defendant has withdrawn his challenge to the order of restitution and accordingly it is waived.