Filed 9/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESUS SUAZO,<br><br>    Defendant and Appellant. | F082140<br><br>(Super. Ct. No. VCF351198)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County. Juliet L. Boccone, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Jesus Suazo was convicted of second degree murder (Pen. Code,[1] § 187, subd. (a); count 1); gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count 2); driving under the influence and causing bodily injury (Veh. Code, § 23153, subd. (a); count 3); driving with a blood-alcohol level of 0.08 percent or more and causing bodily injury (Veh. Code, § 23153, subd. (b); count 4); leaving the scene of an accident (Veh. Code, § 20001, subd. (a); count 5); and driving on a suspended license (Veh. Code, § 14601.2, subd. (a); count 6). Additionally, as to counts 2, 3, and 4, the jury found defendant had suffered a prior conviction for driving under the influence (§ 191.5, subd. (d); Veh. Code, § 23152, subd. (b)). As to count 2, the jury found defendant fled the scene of the crime. (Veh. Code, § 20001, subd. (c)). As to counts 3 and 4, the jury found defendant inflicted great bodily injury on the victim. (§ 12022.7, subd. (a).)

Defendant was sentenced on count 5 to the upper term of four years, and on count 1 to a term of 15 years to life. A lower-term sentence on count 2, and middle-term sentences on counts 3 and 4, were imposed and stayed. (§ 654.) No sentence was imposed on count 6. As relevant here, the court ordered defendant to pay $5,000 in restitution to Garton Tractor Company (Garton) under section 1202.4, subdivision (f).

On appeal, defendant contends the evidence was insufficient to support his conviction of second degree murder in light of his testimony that he drank alcohol without intending to drive afterward, then drove while unconscious. He additionally contends the trial court erred in failing to give, or his trial counsel was ineffective in failing to request, instructions on unconsciousness and voluntary intoxication with regard to count 5 and the fleeing-the-scene allegation to count 2. He also contends remand is required for the court to resentence him in light of Senate Bill No. 567 (2021-2022 Reg. Sess.), statutes 2021, chapter 731 (Senate Bill No. 567), and Assembly Bill No. 124

---

[1] Undesignated statutory references are to the Penal Code.

(2021-2022 Reg. Sess.), statutes 2021, chapter 695 (Assembly Bill No. 124), and the court erred in ordering restitution in favor of Garton because the company was not a direct or derivative victim of a crime of which defendant was convicted.

We accept the People's concession that remand is required for resentencing consistent with Senate Bill No. 567 and Assembly Bill No. 124. We reject defendant's remaining contentions and otherwise affirm the judgment.

## FACTS

Defendant, while having an elevated blood-alcohol level, drove his 2008 Ford Focus at a high rate of speed off the highway, through a fence, and into agricultural equipment parked in an adjacent yard. His passenger, Anna Maria Solorio Zuniga (Solorio), was ejected from the vehicle and killed.

## I. THE ACCIDENT SCENE

On May 13, 2017, at approximately 4:00 a.m., California Highway Patrol Sergeant N. Hunt was dispatched to a traffic collision on southbound Highway 99, just north of Avenue 200 in Tulare County. She was told that a vehicle had possibly rolled over and was unoccupied. Hunt was the first officer to arrive on scene at approximately 4:11 a.m. She observed a silver sedan in a grassy area on the west side of the highway, between a chain link fence and the edge of the roadway. The passenger door of the vehicle was detached and missing.

Hunt located an unresponsive female, who appeared to have been ejected from the vehicle, a few feet in front of the sedan's front bumper. She was deceased.[2]

Hunt began to survey the area, looking for other persons who may have been ejected from the vehicle. She noticed a chain link fence toward the passenger side of the

_____

[2] The woman, later determined to be Solorio, died of blunt force trauma injuries, which were consistent with a vehicle collision. At the time of her autopsy, Solorio had a blood-alcohol content of 0.16 percent.

3.

vehicle was severely damaged. She determined that the vehicle must have gone through the fence into an area occupied by an adjacent tractor supply business.

Hunt walked through the area, which contained heavy agricultural equipment, and located the passenger side door of the vehicle wedged onto a large piece of equipment. Hair, consistent with that of the female Hunt had located, was found next to the door. This information, as well as the presence of blood on both interior airbags of the vehicle, led Hunt to conclude the female was likely the passenger. Hunt therefore began to look for the driver.

Soon thereafter, additional units and emergency personnel arrived on scene and began looking through the yard of the agricultural equipment business. Hunt initially remained with the vehicle to preserve the blood evidence but, after about 20 minutes, joined the search. After a few minutes, Hunt spotted a shadow of an occupant sitting in the cab of a trailer about a hundred feet from the vehicle. The door of the cab was closed. Hunt walked up the steps to the cab and knocked on the door, announced herself as law enforcement, and told the occupant to come out. The occupant, who Hunt identified at trial as defendant, did not make eye contact and, using "the F word," said he would not come out. Hunt opened the door and said, "If you don't come out, I'll have to physically remove you." Defendant responded something to the effect of, "Go ahead, remove me." Hunt said, "Okay," and stepped into the cab, at which point defendant stood up. Hunt backed down the stairs and defendant came out on his own. Inside the cab, Hunt noticed a little bit of blood or blood residue on the seat and the steering wheel. Defendant had open wounds that were bleeding.

At that point, California Highway Patrol Officer B. Elliott took over the investigation. Elliott noticed that defendant's eyes were bloodshot and watery, his gait was unsteady and off balance, he walked slowly and with deliberate steps, and an odor of alcoholic beverage emitted from his breath while conversing. These signs were consistent with someone who is under the influence. Defendant denied any medical or

4.

mechanical issues that might have contributed to the collision. Defendant denied having any injuries, although he had lacerations on his forehead and seemed disoriented and confused. Defendant was aware and conscious during the interaction and his answers were responsive to the questions asked.

Defendant admitted driving the vehicle. He informed Elliott that he had come from his sister-in-law's birthday party at a restaurant in Tulare and was driving to Pixley. He acknowledged he had been drinking and said "they [had] two buckets" of beer. Defendant reported that he started drinking at 10:00 p.m. the night before and stopped drinking at 1:00 a.m. He reported he was no longer feeling the effects of alcohol by the time he was speaking with Elliott. He did not drink any more alcohol after the collision. When asked if he should have been driving, defendant responded, "No, I shouldn't have been driving at all," and stated, "My brother told me not to drive." Additionally, "[h]e said he fucked up, he fucked up his car. He said he fucked everything up." Defendant repeatedly stated he should not have been driving.

Elliott performed field sobriety tests on defendant, which included the horizontal gaze nystagmus, the one-legged stand, and the finger count, before administering testing with a preliminary alcohol screening (PAS) device. On the horizontal gaze nystagmus, defendant's response indicated a blood-alcohol level of 0.10 percent or higher. Defendant performed poorly on the one-legged stand, to the point that Elliott discontinued the test because he was concerned defendant would fall to the ground. Defendant also had difficulty understanding Elliott's instructions regarding the test. During the finger count test, defendant miscounted and fumbled every count, before discontinuing the test part way through and beginning to cry. Elliott performed two PAS tests on defendant. The first registered defendant's blood-alcohol level at 0.139 percent; the second registered 0.148 percent. Based on all of the foregoing, Elliott formed the opinion that defendant was unable to safely operate a motor vehicle because he was under the influence of an alcoholic beverage.

Elliott placed defendant under arrest. He found Solorio's identification card and cell phone in defendant's pocket. Another cell phone was found in the vehicle. Elliott transferred defendant to a hospital where he underwent a blood test. The blood sample was taken at 6:04 a.m. and revealed a blood-alcohol content of 0.14 percent.

## II. INVESTIGATION

On Highway 99, Elliott observed tire friction marks leading into dirt tracks, and eventually through weeds or grass in a straight line directly through the fence into the agricultural equipment yard. The posted speed limit in this area of Highway 99 was 70 miles per hour. Elliott also observed a piece of agricultural equipment with vehicle parts attached to it and tire friction marks on it. There were no tracks or marks on the ground nearby, indicating to Elliott that the vehicle was airborne at the time it struck the equipment. He also located a bloody fingerprint and bloody palmprint on the top of the driver's side door, near the rear of the door. This indicated to Elliott that the driver had exited the driver's side door after the collision, eliminating Solorio as the potential driver. Elliott noticed that the passenger seatbelt was severed and removed from the vehicle.

The airbag control module of defendant's Ford Focus recorded that the vehicle was traveling just over 100 miles per hour four seconds prior to the crash and the accelerator was 64 percent depressed. Two seconds prior to the crash, the vehicle was traveling approximately 95 miles per hour with the accelerator 70 percent depressed. One second prior to, and at the time of, the collision, the vehicle was traveling approximately 91 miles per hour and the accelerator was not depressed. The brakes were not depressed during the four seconds prior to the collision. The control module did not indicate that there were any mechanical issues with the car prior to the collision.

Both the driver's side and passenger side seatbelts were in use just prior to and during the collision. Examination of the vehicle after the collision revealed that the passenger seatbelt buckle was still engaged with the latch plate, but the seatbelt itself was not attached.

6.

## III. PRIOR CONVICTION AND LICENSE SUSPENSION

Defendant had a prior conviction for driving under the influence, with an incident date of July 22, 2013, and a conviction date of June 9, 2014. In conjunction with his plea in that case, defendant acknowledged that being under the influence of alcohol "impairs [his] ability to safely operate a motor vehicle"; that "it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both"; and that if he continued to do so and someone was killed as a result of his driving, he could be charged with murder.

Additionally, a DMV record admitted at trial showed that defendant's driver's license was suspended at the time of the collision.

## IV. DEFENSE CASE

Defendant testified in the defense case.

Defendant acknowledged that he pled no contest to driving under the influence in 2014. He continued to drive after that date because driving was his transportation to work. He drove often.

On the night of May 12, 2017, defendant got off work around 8:30 p.m. and went to his brother's home, where defendant also lived. Defendant was tired and did not have plans to go out. His brother called and invited him to go to a restaurant to celebrate defendant's sister-in-law's birthday. Defendant told his brother he did not want to go out. However, defendant decided to go to the party "for a little bit." Defendant drove himself to the restaurant. He initially testified he did not have a plan for leaving. However, he later testified he planned to leave his car at the restaurant and get a ride home with his brother or someone else, as all the guests were going to his brother's house afterward.

Defendant arrived at the restaurant around 10:00 p.m. A lot of people were there. Solorio arrived approximately one hour later. Solorio was related to many of the guests, including defendant's sister-in-law. Defendant met Solorio once before, approximately

7.

three weeks prior, at his brother's house. Since that time, they had been in touch by phone and text.

When Solorio arrived at the party, she gave defendant a hug and they continued to spend the rest of the night together dancing. Solorio did not have a purse and defendant offered to hold her phone and her identification.

Defendant explained that the two buckets of beer he mentioned to Elliott had been for the whole table. Defendant purchased the buckets, but they were for everyone.

Defendant did not recall leaving the party or driving. The last thing he remembered prior to the collision was dancing and drinking. He then recalled walking toward the deputies and speaking with them, but did not recall the full conversation. He did not recall going to the hospital but recalled waking up at the hospital. He received staples in his head and, at the time of trial, he continued to have constant headaches as a result of his injuries. He did not find out Solorio had died until he was at the hospital.

On cross-examination, defendant acknowledged he initialed a form when he entered his plea in 2014, but he did not recall filling out the form or going over it with his attorney. He acknowledged he did not have a valid driver's license at the time of the collision. He knew his driver's license was suspended due to a prior conviction for driving under the influence. He denied driving under the influence at any time after his conviction, other than on the night of the incident. However, he did drink alcohol during that time period and was familiar with the feeling of drinking both small and large amounts of alcohol. He did not, during that time period, ever drink to a point where he believed himself to be drunk or intoxicated.

Defendant acknowledged that he knew, both prior to and after his first conviction for driving under the influence, that it was dangerous to drive under the influence of alcohol. He knew people could die as a result of collisions when a driver is under the influence, and he had friends who had been killed by intoxicated drivers and also friends who had been the drivers in such incidents.

Defendant could not recall how much he drank on the night of the incident. He acknowledged that he planned to drink when he went to the party. He knew that it would not be safe for him to drive. At trial, he did not recall having a conversation with his brother at the restaurant. He was not aware of his brother being designated as a sober driver. Rather, he planned on getting a ride home with any one of the many people in attendance.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence is insufficient to support his conviction for second degree murder because credible evidence establishes he drank without intending to drive, then drove while not conscious of doing so. According to defendant, the evidence thereby establishes he both lacked subjective awareness of the danger to life posed by his actions and did not act with deliberate and conscious disregard for life. We conclude substantial evidence supports the conviction.

#### A. STANDARD OF REVIEW

"The test for evaluating a sufficiency of evidence claim is deferential[.]" (*People v. Flores* (2020) 9 Cal.5th 371, 411.) In reviewing the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Flores*, at p. 411.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

## B.   APPLICABLE LAW

To support a finding of second degree murder based on implied malice, the evidence must establish that the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of its danger to life and a conscious disregard of that danger.  (*People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*).)  This conscious disregard for the danger to the life of another distinguishes implied malice from gross negligence, which involves "the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences."  (*Id.* at p. 296.)  "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'  The state of mind of the person who acts with conscious indifferences to the consequences is simply, 'I don't care what happens.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988 (*Olivas*).)  Implied malice requires that the defendant actually appreciated the risk involved.  (*Watson*, *supra*, at pp. 296–297.)  "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less."  (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)

*Watson* is the leading case on vehicular murder involving implied malice.  There, the defendant drove to a bar and consumed large quantities of beer.  After leaving the bar, he drove through a red light and narrowly avoided a collision with another car.  He then drove away at high speed, accelerating to 84 miles per hour before suddenly braking and skidding into an intersection where he collided with another car, killing two people.  The defendant's blood-alcohol level one-half hour after the collision was 0.23 percent.  An information charged him with two counts of second degree murder, but the trial court dismissed the murder counts.  (*Watson*, *supra*, 30 Cal.3d at pp. 293–294.)

On the People's appeal, our Supreme Court reversed the dismissal, holding there was sufficient evidence to uphold the second degree murder counts in the information.

10.

(*Watson*, *supra*, 30 Cal.3d at p. 301.)  The court cited to the following evidence as sufficient to support a finding that the defendant acted with conscious disregard for life: the defendant's blood-alcohol level was sufficient to find him legally intoxicated; he drove to the establishment where he was drinking knowing that he had to drive later; he presumably was aware of the hazards of driving while intoxicated; he drove at high speeds on city streets, creating a great risk of harm or death; and he was aware of the risk, as shown by the near collision and his belated attempt to brake before the fatal collision. (*Id.* at pp. 300–301.)

Since *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol.  (E.g., *People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 (*Wolfe*) [driver had blood-alcohol level of 0.34 percent, was aware of dangers of drinking and driving and had previously used a taxi service, drank with intention of driving home, and continued driving her damaged vehicle after hitting a pedestrian]; *People v. Autry* (1995) 37 Cal.App.4th 351, 358–359 (*Autry*) [driver had a blood-alcohol level of 0.22 percent, was warned of the dangers of drinking and driving, drank and drove throughout the day, had three near misses, and continued driving over protests of his passengers]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746–747 [driving wrong way on a freeway with a blood-alcohol level between 0.18 and 0.23 percent]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533 [crossing into oncoming traffic on two-lane highway with a blood-alcohol level of 0.27 percent]; *Olivas*, *supra*, 172 Cal.App.3d at p. 989 [extremely dangerous driving while under influence of PCP and "negligible" amount of alcohol].)  These opinions have generally relied on some or all of the factors that were present in *Watson*:  "(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*Autry*, *supra*, at p. 358.)  However, "courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a

case-by-case approach." (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 698.)

### C. ANALYSIS

Defendant does not dispute that he drove with a blood-alcohol level well above the legal limit, knew the hazards of driving while intoxicated, and engaged in highly dangerous driving. Rather, he argues that the evidence does not support a finding of implied malice because his testimony suggested he did not have a predrinking intent to drive, and he thereafter drove while in an unconscious stupor.[3]

We first note that a predrinking intent to drive is not required before a jury may find implied malice. Rather, this is only one of the *Watson* factors that may be considered in determining whether a driver acted with implied malice. (*Olivas*, *supra*, 172 Cal.App.3d at p. 988.) Regardless, substantial evidence supports a finding that defendant drove himself to the restaurant with the intent to drink there, and with no plan to avoid driving himself home. We acknowledge defendant's testimony that he planned to leave his car at the restaurant and ride home with another guest. However, defendant's testimony in this regard conflicts with his earlier testimony that he drove himself to the restaurant with *no plan* for getting home. Defendant testified that he "wasn't aware" of his brother being a designated driver, and he had no confirmed plan to get a ride home with any specific person. Furthermore, defendant told Elliott that his brother had told him not to drive, indicating defendant's brother likewise anticipated that defendant planned to drive himself home.

---

[3] Defendant does not identify the evidence that supports his contention that he was unconscious when driving. As defendant acknowledges, unconsciousness at the time of the collision, standing alone, does not refute a finding of implied malice for purposes of second degree *Watson* murder, because a defendant's mental state when he begins drinking may establish the requisite mens rea. (*People v. Whitfield* (1994) 7 Cal.4th 437, 454–455 (*Whitfield*), superseded by statute on another ground as discussed *post*; accord, *Watson*, *supra*, 30 Cal.3d at pp. 300–301.)

12.

Thus, when the whole record is viewed in the light most favorable to the judgment, it discloses substantial evidence that defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of its danger to life and a conscious disregard of that danger. (*Watson*, *supra*, 30 Cal.3d at p. 300.) Defendant drove himself to the birthday party with plans to drink and no plan to avoid driving himself home. He proceeded to consume alcoholic beverages to the point of intoxication without formulating a plan to avoid driving. He then engaged in highly dangerous driving with a blood-alcohol level well above the legal limit. In the aftermath of the collision, he expressed knowledge that he should not have been driving. He provided Elliott with coherent information regarding his whereabouts and actions prior to the collision, suggesting he was conscious when he engaged in this conduct and able to appreciate – and disregard – the attendant dangers. This evidence is sufficient to support defendant's conviction for second degree *Watson* murder.

## II.     UNCONSCIOUSNESS AND VOLUNTARY INTOXICATION

Defendant concedes he was not entitled to instructions on voluntary intoxication or unconsciousness with respect to the murder charge. However, he contends the jury was permitted to consider his voluntary intoxication and unconsciousness, to the extent they bore on whether he had the knowledge required for violation of Vehicle Code section 20001, subdivision (a) (count 5) and the Vehicle Code section 20001, subdivision (c) leaving-the-scene allegation on count 2. He contends the trial court had a duty to instruct on these concepts sua sponte or, alternatively, his counsel was ineffective in failing to request such instructions.

13.

In light of defendant's claim of ineffective assistance of counsel, we address and reject his claims on the merits.[4]  (See *People v. Riel* (2000) 22 Cal.4th 1153, 1192.)  We conclude neither voluntary intoxication nor unconsciousness was an available defense to count 5 or the enhancement allegation to count 2.  Accordingly, defendant was not entitled to instructions on these inapplicable defenses.

## A.     APPLICABLE LAW

Vehicle Code section 20001, subdivision (a) provides:  "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of [Vehicle Code s]ections 20003 and 20004."  Vehicle Code section 20001, subdivision (c) provides an additional term of imprisonment for a person who flees the scene of the crime after committing certain forms of vehicular manslaughter.

Violation of Vehicle Code section 20001, subdivision (a) is a general intent crime, but actual or constructive knowledge of the resulting injury is an essential element. (*People v. Holford* (1965) 63 Cal.2d 74, 80 (*Holford*); *People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1237 (*Nordberg*).)  "[C]riminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (*Holford*, at p. 80; see *People v. Harbert* (2009) 170 Cal.App.4th 42, 53.)  This same knowledge element also applies to the fleeing-the-scene enhancement (Veh. Code, § 20001, subd. (c)). (*Nordberg*, at p. 1238.)

---

[4] " '[A]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.)  Additionally, such instruction is warranted only when supported by substantial evidence.  (*Ibid*.)

**B.** **VOLUNTARY INTOXICATION**

Section 29.4 provides, in relevant part:

> "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

> "(b) *Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent*, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."  (Italics added.)

By its plain terms, section 29.4, subdivision (b) allows for admission of evidence of voluntary intoxication solely with regard to specific intent crimes.  As defendant acknowledges, neither felony hit and run under Vehicle Code section 20001, subdivision (a), nor the enhancement for fleeing the scene under Vehicle Code section 20001, subdivision (c), requires a showing of specific intent.  As such, under the plain language of section 29.4, voluntary intoxication was not relevant to the offense or the enhancement.  Accordingly, the trial court was not required to instruct on voluntary intoxication and counsel was not constitutionally ineffective in failing to request this inapplicable instruction.

Nonetheless, defendant argues that "specific intent" as used in section 29.4 "broadly encompasses the knowledge element of a general intent crime."  To address this contention, we review the history of section 29.4 and its surrounding case law before discussing the merits of defendant's argument.

### i.       History of Section 29.4

Former section 22 was the predecessor statute to section 29.4.  Initially drafted in 1872, former section 22 provided:  "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.

15.

But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

Under this version of former section 22, "intoxication was generally relevant to the defense of diminished capacity." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1125 (*Mendoza*).) However, in *Hood*, our Supreme Court specified that voluntary intoxication under former section 22 was relevant to negate the existence of a specific intent but not a general criminal intent. (*People v. Hood* (1969) 1 Cal.3d 444, 456 (*Hood*).) The high court observed that "[s]pecific and general intent have been notoriously difficult terms to define and apply." (*Ibid*.) Nonetheless, the high court explained: "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.* at pp. 456–457.)

In *Hood*, the high court determined that voluntary intoxication was not pertinent to the offense of assault or assault with a deadly weapon. (*Hood*, *supra*, 1 Cal.3d at p. 457.) The court acknowledged that assault could be considered a specific intent crime under the prevailing definition requiring an "intention to do a future act or achieve a particular result," inasmuch as assault requires an intent to commit a battery. (*Ibid.*) However, the court opined that assault also could be characterized as a general intent crime, inasmuch as it involves an intent "merely to do a violent act." (*Id.* at p. 458.) Resorting to "other considerations," the court noted that "a drunk man is capable of forming an intent to do something simple, such as strike another, unless he is so drunk that he has reached the stage of unconsciousness. What he is not as capable as a sober man of doing is

16.

exercising judgment about the social consequences of his acts or controlling his impulses toward anti-social acts. He is more likely to act rashly and impulsively and to be susceptible to passion and anger. It would therefore be anomalous to allow evidence of intoxication to relieve a man of responsibility for the crimes of assault with a deadly weapon or simple assault, which are so frequently committed in just such a manner." (*Ibid*.)

In contrast, in *People v. Foster* (1971) 19 Cal.App.3d 649 (*Foster*), the Court of Appeal determined that voluntary intoxication was relevant to the offense of unlawful possession of narcotics. (*Id.* at pp. 656–657.) The court noted that "[former] section 22 has been construed to mean that voluntary intoxication may not be considered when the crime charged is a 'general intent' crime, i.e., one requiring nothing more than the intent to do the proscribed act, but that it may be considered in determining whether a particular purpose, motive or intent actuated the accused." (*Id.* at p. 654.) The court further noted that, "to convict the accused of the crime of unlawful possession of narcotics, the People must, in addition to proving general intent to possess the substance constituting the contraband, prove that the accused had knowledge that the material in his possession was a narcotic." (*Id.* at p. 655.) Recognizing that "knowledge is not identical with intent," the court determined knowledge nonetheless was "properly embraced within the concepts of 'purpose' and 'motive' delineated in" former section 22. (*Foster*, at p. 655.)

Soon thereafter, in 1981, former section 22 was amended. (Stats. 1981, ch. 404, § 2.) The 1981 amendment "was part of a broader statutory revision that abolished the defense of diminished capacity while preserving the relevance of voluntary intoxication to the question whether the defendant *actually* had the necessary mental state for the charged offense." (*Mendoza*, *supra*, 18 Cal.4th at p. 1125.) As amended, former section 22 provided, in relevant part:

> "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.

17.

Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, with which the accused committed the act.

"(b) Whenever the actual existence of any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, is a necessary element to constitute any particular species or degree of crime, evidence that the accused was voluntarily intoxicated at the time of the commission of the crime is admissible on the issue as to whether the defendant actually formed any such mental state." (Stats. 1981, ch. 404, § 2.)

"The broad references in subdivision (b) of [former] section 22, as amended in 1981, to 'any mental state' and to 'intent' raised concerns, however, that the statute could be construed, contrary to the Legislature's intent, to alter the well-settled rule that evidence of voluntary intoxication is inadmissible to negate the existence of *general* criminal intent." (*Whitfield*, *supra*, 7 Cal.4th at p. 448.) Thus, the Legislature again amended former section 22 in 1982, "replacing the term 'intent' with the phrase 'a required specific intent' and adding the concluding phrase 'when a specific intent crime is charged.' [Citation.] The Legislature stated that this amendment was 'declaratory of existing law,' thus making clear that it was seeking simply to clarify the scope of the 1981 amendments." (*Whitfield*, at p. 448.) As amended in 1982, former section 22 read, in relevant part:

"(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation or malice aforethought, with which the accused committed the act.

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (Stats. 1982, ch. 893, § 2.)

18.

It was this language that our Supreme Court interpreted in *Whitfield.* There, relying on *Hood*, the court held that evidence of voluntary intoxication was admissible to negate implied malice for the offense of second degree murder. (*Whitfield*, *supra*, 7 Cal.4th at p. 450.) The high court acknowledged that second degree implied malice murder was a general intent crime. (*Ibid.*) Nonetheless, the court opined that "the element of implied malice that requires that the defendant act with knowledge of the danger to, and in conscious disregard of, human life, is closely akin to *Hood*'s definition of specific intent, which requires proof that the defendant acted with a specific and particularly culpable mental state." (*Ibid.*) Thus, the court surmised, "the phrase 'when a specific intent crime is charged' in [former] section 22 includes murder, even where the prosecution relies exclusively upon the theory that malice is implied, rather than express." (*Ibid.*)

Justice Mosk, joined by Chief Justice Lucas and, in a separate opinion, Justice Baxter, would have found voluntary intoxication evidence inadmissible to negate implied malice. (See *Whitfield*, *supra*, 7 Cal.4th at pp. 456–457 (conc. & dis. opn. of Mosk, J.); *id.* at p. 477 (conc. & dis. opn. of Baxter, J.).) Justice Mosk argued that " '[g]eneral intent' and 'specific intent' are shorthand devices best and most precisely invoked to contrast offenses that, as a matter of policy, may be punished despite the actor's voluntary intoxication (general intent) with offenses that, also as a matter of policy, may not be punished in light of such intoxication if it negates the offense's mental element (specific intent). [Citation.] Evidence of voluntary intoxication may be introduced to negate an element of offenses requiring relatively complex cogitation—a mental function integral to many crimes that contain a 'definition [that] refers to defendant's intent to do some further act or achieve some additional consequence . . .' [citation]—because alcohol can interfere with such intent [citation]." (*Whitfield*, at p. 463 (conc. & dis. opn. of Mosk, J.).) Justice Mosk further argued that evidence of voluntary intoxication cannot exculpate "implied-malice murder: alcohol intoxication naturally lends itself to the

crime's commission because it impairs the sound judgment or lowers the inhibitions that might stop a sober individual from committing a highly dangerous act leading to another's death." (*Ibid*.) To Justice Mosk, the key inquiry is "whether policy considerations permit the introduction of voluntary intoxication evidence to negate an element of the crime." (*Ibid*.)

In reaction to *Whitfield*, the Legislature again promptly amended former section 22. (See *People v. Soto* (2018) 4 Cal.5th 968, 977 (*Soto*); *Mendoza*, *supra*, 18 Cal.4th at p. 1126.) In so doing, the Legislature explained: " 'Under existing law, as held by the California Supreme Court in [*Whitfield*], the phrase "when a specific intent crime is charged" includes murder even where the prosecution relies on a theory of implied malice. [¶] This bill would provide, instead, that evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.' " (*Mendoza*, at p. 1126.) The Legislature thereby "adopted Justice Mosk's position that evidence of voluntary intoxication is not admissible on the question of implied malice, that is, to prove that defendants did not know of the danger they were creating by their actions, or that they did not consciously disregard that danger. Indeed, some of the legislative history behind the amendment refer to his dissenting opinion with approval." (*Soto*, at p. 977.) As amended in 1995, former section 22 provided, in relevant part:

> "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

> "(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific

20.

intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."[5] (Stats. 1995, ch. 793, § 1.)

This version of former section 22 was at issue in *People v. Reyes* (1997) 52 Cal.App.4th 975 (*Reyes*), the case on which defendant primarily relies. *Reyes* involved a prosecution for receiving stolen property, in which the defendant claimed to have found the stolen property on a street curb. (*Id.* at pp. 979–981.) The defendant sought to introduce expert psychological testimony regarding his mental disorders and drug use to establish he lacked knowledge the property was stolen. (*Id.* at p. 981.) The trial court denied the request and, on appeal, the defendant argued the expert testimony was admissible under former section 22. The Court of Appeal held the defendant was entitled to introduce evidence concerning his voluntary intoxication and mental disorders as it affected the knowledge element of a crime. (*Reyes*, at pp. 984–986.) The court reasoned that, "with regard to the element of knowledge, receiving stolen property is a 'specific intent crime,' as that term is used in [former] section 22, subdivision (b)." (*Id.* at p. 985.)

In reaching this conclusion, *Reyes* relied in part on *Whitfield*. (*Reyes*, *supra*, 52 Cal.App.4th at p. 984.) The *Reyes* court acknowledged that former section 22 had been amended following the high court's opinion in *Whitfield*, but the court nonetheless concluded the *Whitfield* analysis "remain[ed] germane to the admissibility of evidence of intoxication to refute the element of knowledge in other types of crimes, such as receiving stolen property." (*Reyes*, at p. 984, fn. 6.) *Reyes* also relied on *People v. Fabris* (1995) 31 Cal.App.4th 685, 696, footnote 10, disapproved by *People v. Atkins* (2001) 25 Cal.4th 76, 90, footnote 5, for the proposition that " 'the criteria of specific intent for [the purpose of section 22] are not necessarily the same as the criteria of specific intent as a measure of the scienter required for an offense.' " (*Reyes*, *supra*, 52

---

[5] In 2013, this version of former section 22 was renumbered section 29.4 with no change in text. (Stats. 2012, ch. 162, § 119.)

Cal.App.4th at p. 984.) Finally, *Reyes* quoted *Foster*, *supra*, 19 Cal.App.3d at page 655, for the proposition that evidence of intoxication is admissible in a narcotic possession prosecution because " '[i]ntoxication has obvious relevance to the question of awareness, familiarity, understanding and the ability to recognize and comprehend' " (*Reyes*, at p. 983).

Meanwhile, a separate line of Supreme Court cases developed regarding the relevance of voluntary intoxication evidence. In *Mendoza*, *supra*, 18 Cal.4th 1114, the high court considered the impact of voluntary intoxication on aider and abettor liability. The high court noted that an aider and abettor must " 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*Id*. at p. 1123.) Because the knowledge requirement was entwined with intent, the high court concluded it was akin to the specific intent described in former section 22, making voluntary intoxication evidence admissible on the issue of whether the defendants had the requisite mental state of knowledge, in addition to intent. (*Mendoza*, at p. 1131.) However, the court described its holding as "very narrow" and pertaining only to aiding and abetting. (*Id*. at p. 1133.)

Thereafter, the high court declined to extend the holding of *Mendoza* to other general intent crimes. In *People v. Atkins* (2001) 25 Cal.4th 76, 92–93 (*Atkins*), the high court held that evidence of voluntary intoxication was inadmissible to negate the mental state required for arson. (*Id*. at p. 93.) The court noted that arson merely requires "the general intent to perform the criminal act" (*id*. at p. 88), and was based on "relatively simple impulsive behavior" (*id*. at p. 91), to which voluntary intoxication does not apply based on the policy considerations articulated in *Hood* (*id*. at p. 92). *Atkins* also distinguished arson from the aiding and abetting addressed in *Mendoza* on the ground "the definition of arson does not refer to [the] defendant's intent to do some further act or achieve some additional consequence." (*Id*. at p. 93.)

22.

More recently, our Supreme Court held that section 29.4 does not permit consideration of voluntary intoxication evidence to prove unreasonable self-defense in a case involving express malice. (*Soto*, *supra*, 4 Cal.5th at pp. 974–981.) The defendant had argued "that section 29.4 permits evidence of voluntary intoxication on the question of whether he actually believed in the need for self-defense, that is, whether he *intended* to kill unlawfully." (*Id.* at p. 975, italics added, original italics omitted.) The court rejected this argument, explaining that express malice requires an intent to kill, while implied malice does not. (*Id.* at p. 976.) The court noted that section 29.4 expressly refers to express malice, thus indicating the Legislature's particular concern with this " 'required specific intent.' " (*Soto*, at p. 976.) "By contrast, the absence of a belief that the killing was necessary for self-defense is not a 'required specific intent.' " (*Ibid.*) The high court further noted:

> "[A] belief that it is necessary to kill in self-defense does not involve the ' "intent to do some further act or achieve some additional consequence." ' [Citation.] Rather, it involves *judgment*. Intoxication can distort a person's perception of the unfolding circumstances, and thereby impair the sound judgment that is needed when deciding to use lethal force in self-defense. Accordingly, voluntary 'intoxication naturally lends itself to the crime's commission because it impairs the sound judgment or lowers the inhibitions that might stop a sober individual' from killing a perceived assailant." (*Id.* at p. 977.)

The high court determined the Legislature intended former section 22, and thus current section 29.4, "to prohibit voluntary intoxication from being an excuse for poor judgment when someone kills." (*Soto*, *supra*, 4 Cal.5th at p. 978.) The court summarized the intent of the Legislature as follows: " 'If you voluntarily choose to become intoxicated and then kill someone, you may not claim that you were so intoxicated you were unaware your victim posed no threat to you when you killed[.]' " (*Id.* at pp. 978–979.) The court also rejected the defendant's reliance on *Mendoza*, given

23.

that unreasonable self-defense did not involve the "intent to do some further act or achieve some additional consequence." (*Id.* at p. 979.)

Finally, the holding of *Reyes* has recently come under scrutiny. *Reyes*'s conclusion that evidence of voluntary intoxication is admissible to cast doubt on the scienter element of a general intent crime has been questioned on the ground *Reyes* is based on authorities that are either inapposite or no longer have precedential effect. (See *People v. Berg* (2018) 23 Cal.App.5th 959, 968–969 (*Berg*).) As noted in *Berg*, "*Fabris* and *Whitfield* are no longer binding because *Fabris* was disapproved by the Supreme Court and *Whitfield* was abrogated by the Legislature." (*Id*. at p. 969.) Furthermore, *Foster* involved interpretation of a "much broader voluntary intoxication statute" and "does not support the admissibility of voluntary intoxication evidence under the more restrictive section 29.4." (*Ibid.*) Thus, the *Berg* court declined to follow *Reyes*, and ultimately held that possession of a controlled substance is a general intent crime for which evidence of voluntary intoxication is inadmissible. (*Id.* at pp. 968–969.) The *Berg* court specifically rejected the defendant's argument that "evidence of voluntary intoxication 'may be introduced by a defendant in order to raise a reasonable doubt regarding a specific mental state, such as knowledge, that is an element of a general intent offense.' " (*Id.* at p. 969.) The court determined this argument was contrary to the plain language of section 29.4. (*Berg*, at p. 969.)

### ii.    Analysis

We once again begin our analysis with the plain language of section 29.4. With regard to nonmurder offenses, section 29.4 provides that "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent." (§ 29.4, subd. (b).) As *Berg* aptly explained, the plain language of the statute does not permit the admission of voluntary intoxication evidence on the issue of whether or not the defendant met the knowledge requirement of a general intent crime. (*Berg*, *supra*, 23 Cal.App.5th at p. 969.) We further agree with *Berg* that

24.

*Reyes* is not persuasive on this point, inasmuch as its analysis is based on authorities that have been abrogated or disapproved. (*Ibid.*)

The sole Supreme Court case to hold that voluntary intoxication evidence is admissible as to knowledge is *Mendoza*. However, the *Mendoza* court characterized its holding as "very narrow." (*Mendoza, supra,* 18 Cal.4th at p. 1133.) The holding was based on the specific nexus between an aider and abettor's knowledge of the criminal purpose of the perpetrator, and his or her intent to commit, facilitate, or encourage the commission of that offense. (*Ibid.*) In the absence of such nexus, the high court has declined to extend *Mendoza* to general intent crimes.[6] (*Atkins, supra,* 25 Cal.4th at pp. 92–93; *Soto, supra,* 4 Cal.5th at pp. 974–981.) No such nexus exists under Vehicle Code section 20001, subdivision (a) or (c). Stated differently, Vehicle Code section 20001 "does not refer to defendant's intent to do some further act or achieve some additional consequence." (*Atkins,* at p. 93.) Thus, the knowledge requirement of Vehicle Code section 20001, subdivisions (a) − count 5 − and (c) − the allegation attached to count 2 − is not a "required specific intent" that may be negated by voluntary intoxication pursuant to section 29.4.

Furthermore, to the extent our Supreme Court has suggested policy considerations guide our determinations regarding the extent to which voluntary intoxication may negate general intent, the policy considerations articulated in *Hood*, and later in Justice Mosk's separate opinion in *Whitfield*, counsel against permitting defendant to argue voluntary intoxication prevented him from possessing the knowledge necessary to violate Vehicle Code section 20001. (See *Soto, supra,* 4 Cal.5th at pp. 977–979; *Whitfield, supra,* 7 Cal.4th at p. 463 (conc. & dis. opn. of Mosk, J.); *Hood, supra,* 1 Cal.3d at p. 457; but see *Soto,* at pp. 984–985 (conc. & dis. opn. of Liu, J.) [disagreeing with court's reliance on

---

[6] At least one justice has suggested that *Mendoza* was "wrongly decided" and "will continue to wreak havoc in the lower courts for years to come." (*Atkins, supra,* 25 Cal.4th at p. 96 (conc. opn. of Brown, J.).)

policy arguments to determine relevance of voluntary intoxication].) Fleeing the scene of an accident is an offense involving the perpetrator's judgment. To the extent voluntary intoxication "impairs the sound judgment or lowers the inhibitions that might stop a sober individual from" fleeing the scene of an accident, it should not be allowed to negate the perpetrator's general intent. (*Whitfield*, at p. 463 (conc. & dis. opn. of Mosk, J.).)

In sum, neither the plain language of the statute, its legislative history, nor the policy considerations underpinning the statute suggest a legislative intent to permit a defendant accused of fleeing the scene under Vehicle Code section 20001, subdivision (a) or (c) to rely on voluntary intoxication to negate his or her required knowledge of the accident. Accordingly, defendant was not entitled to an instruction on voluntary intoxication.

### C.    UNCONSCIOUSNESS

Unconsciousness generally is governed by section 26. However, unconsciousness caused by voluntary intoxication is governed by section 29.4. (*People v. Conley* (1966) 64 Cal.2d 310, 323–324 [discussing former § 22], superseded by statute on another ground as stated in *People v. Saille* (1991) 54 Cal.3d 1103, 1114; *People v. James* (2015) 238 Cal.App.4th 794, 805.) Thus, as with voluntary intoxication itself, unconsciousness caused by voluntary intoxication can negate specific intent, but is no defense to a general intent crime. (*James*, at p. 805.) For reasons already explained, defendant was not entitled to an instruction with regard to count 5 or with regard to the fleeing-the-scene allegation to count 2 on unconsciousness resulting from voluntary intoxication.

Defendant separately suggests the evidence supported giving an instruction on unconsciousness because he had a head injury and lacked memory of the collision. However, defendant did not present sufficient evidence to raise a reasonable doubt in the minds of the jury as to whether he was unconscious due to a head injury. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1318.) There was no evidence to support a finding that defendant's head lacerations resulted in unconsciousness. Nor does

defendant's testimony support such a finding. Defendant testified at trial that he did not recall leaving the party or driving. The last thing he remembered prior to the collision was dancing and drinking. If anything, this testimony suggests defendant's unconsciousness, if any, arose as the result of his voluntary intoxication prior to the collision. It does not raise a reasonable doubt as to whether the collision rendered him unconscious. Regardless, "[d]efendant's professed inability to recall the event, without more, was insufficient to warrant an unconsciousness instruction." (*People v. Rogers* (2006) 39 Cal.4th 826, 888.)

## III. SENATE BILL NO. 567 AND ASSEMBLY BILL NO. 124

Defendant contends the matter must be remanded for resentencing in light of Senate Bill No. 567 and Assembly Bill No. 124. The People concede remand is required. We accept the People's concession.

### A. SENATE BILL NO. 567

Section 1170, subdivision (b) governs imposition of a judgment of imprisonment when a statute specifies three possible terms. Effective January 1, 2022, Senate Bill No. 567 amended section 1170, subdivision (b), to provide: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (*Id.*, subd. (b)(1).) Subdivision (b)(2) in turn provides, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. . . ." Subdivision (b)(3) creates an exception to this requirement: "Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."

27.

**B.     ASSEMBLY BILL NO. 124**

Assembly Bill No. 124 added subdivision (b)(6) to section 1170, which now provides that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶]  (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  [¶]  (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.  [¶]  (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking."

**C.     ANALYSIS**

As the People concede, Senate Bill No. 567 and Assembly Bill No. 124 are ameliorative changes in law that apply retroactively to defendant.  (*People v. Garcia* (2022) 76 Cal.App.5th 887, 902; see *In re Estrada* (1965) 63 Cal.2d 740, 744–746.)

Here, the trial court imposed an upper-term sentence on count 5, thus implicating Senate Bill No. 567.  Additionally, defendant's statement in mitigation, submitted to the trial court at sentencing, suggests defendant may have a history of childhood trauma, including childhood abuse, thus potentially implicating Assembly Bill No. 124. Accordingly, the People concede the matter must be remanded for resentencing consistent with the changes made to section 1170, subdivision (b).  We accept the People's concession and will remand for resentencing.

**IV.     RESTITUTION**

Defendant contends the trial court lacked statutory authority to order restitution to Garton, the agricultural equipment company whose property was damaged in the collision.  We disagree.

### A. STANDARD OF REVIEW

The question before us is one of statutory interpretation, i.e., whether Garton may be considered a victim for purposes of victim restitution under section 1202.4. (*People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1084.) "The proper interpretation of a statute is a question of law we review de novo. [Citations.] ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." ' " ' " (*People v. Lewis* (2021) 11 Cal.5th 952, 961 (*Lewis*).) "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.)

### B. ADDITIONAL FACTUAL BACKGROUND

The probation officer's report recommended defendant be ordered to pay restitution in the amount of $5,000 to Garton, pursuant to section 1202.4, subdivision (f). The report noted that the company claimed this sum as the insurance deductible it had paid for repairs to their property resulting from the collision. At sentencing, the trial court ordered defendant to pay restitution in the amount of $5,000 to Garton. Defendant did not object to the award.[7]

### C. ANALYSIS

In relevant part, the California Constitution, as amended in 1982 by Proposition 8 (commonly known as the Victims' Bill of Rights), provides: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A); accord, *People v. Martinez* (2017) 2 Cal.5th 1093, 1100 (*Martinez*).)

---

[7] Defendant's failure to object does not waive on appeal his claim that the restitution order constitutes an unauthorized sentence. (See *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1533–1534.)

"At the time Proposition 8 was passed, 'victims had some access to compensation through the Restitution Fund, and trial courts had discretion to impose restitution as a condition of probation.' [Citation.] Courts did not, however, have general statutory authority to order the defendant to pay restitution directly to the victim of his or her crime. [Citation.] In passing Proposition 8, the electorate expanded victims' access to compensation by declaring an 'unequivocal intention . . . that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer,' and instructing the Legislature to adopt legislation to implement this directive." (*Martinez*, at p. 1100.)

The Legislature's response is currently codified in section 1202.4 and reflects the intention of the electorate that "a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) "To that end, section 1202.4 provides that, with certain exceptions not relevant here, 'in every case in which a victim has suffered economic loss *as a result of the defendant's conduct*, the court shall require that the defendant make restitution to the victim or victims.' (*Id.*, subd. (f).) The statute further provides that the court's restitution order shall, '[t]o the extent possible . . . fully reimburse the victim or victims for every determined economic loss incurred *as the result of the defendant's criminal conduct*.' (*Id.*, subd. (f)(3).)" (*Martinez*, *supra*, 2 Cal.5th at pp. 1100–1101, italics added.) This provision "authorizes trial courts to order direct victim restitution for those losses incurred as a result of the crime of which the defendant was convicted." (*Id.* at p. 1101.)

As relevant here, section 1202.4 defines a " 'victim' " to include "[a] corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a *direct victim of a crime*." (§ 1202.4, subd. (k)(2), italics added.) Our Supreme Court has explained that victims are those who are "the real and

30.

immediate objects of the [defendant's] offenses." (*People v. Birkett* (1999) 21 Cal.4th 226, 233.) Our Supreme Court also has explained that section 1202.4 does not distinguish between an actual victim and a derivative victim.[8] (*People v. Giordano* (2007) 42 Cal.4th 644, 656–657 (*Giordano*).)

With the foregoing principles in mind, we consider whether Garton was a direct victim of a crime and incurred losses as a result of defendant's criminal conduct. On this point, we find *Martinez* instructive.

In *Martinez*, the court considered the circumstances under which restitution could be awarded for injuries to a victim of the offense of fleeing the scene of an injury accident, commonly referred to as "hit and run" (Veh. Code, § 20001, subd. (a)). (*Martinez*, *supra*, 2 Cal.5th at p. 1102.) The court observed that " ' "the act made criminal" ' under [Vehicle Code section 20001, subdivision (a)] ' "is not the 'hitting' but the 'running.' " ' " (*Ibid.*) Additionally, Vehicle Code section 20001, subdivision (a) permits a conviction "even if the accident was solely the result of the victim's own negligence." (*Martinez*, at p. 1103.) Thus, although a conviction under Vehicle Code section 20001, subdivision (a) requires the prosecution to establish the occurrence of an accident, it does not require the prosecution to establish " 'the fleeing driver's responsibility' for the underlying accident." (*Martinez*, at p. 1104.)

In light of the foregoing, the high court determined that "[r]estitution for losses incurred 'as a result of the commission of a crime' [citation] includes losses incurred as a

---

[8] However, section 1202.4 also defines " 'victim' " to include "[a] person who is eligible to receive assistance from the Restitution Fund pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code." (§ 1202.4, subd. (k)(4).) "Persons who are eligible to receive assistance from the Restitution Fund include 'derivative victim[s]' (Gov. Code, § 13955, subd. (a)(2)), who are defined as 'individual[s] who sustain[] pecuniary loss as a result of injury or death to a victim.' " (*Giordano*, *supra*, 42 Cal.4th at p. 657.) Defendant argues Garton is not a derivative victim of any of his offenses. We need not address this contention because, as we explain, we conclude Garton was a direct victim of defendant's crimes.

result of the defendant's unlawful flight from the scene of the accident in which he or she was involved, but not losses incurred solely as a result [of] the accident itself." (*Martinez*, *supra*, 2 Cal.5th at p. 1103.)  The court clarified that section 1202.4 does not authorize restitution for "losses caused by noncriminal behavior . . . that is related in some way to the commission of a crime."  (*Martinez*, at p. 1105.)  However, "direct victim restitution is available when the victim's losses are caused by conduct that does, in fact, constitute a crime."  (*Ibid*.)  The court illustrated this principle by explaining that, if a thief steals a car and a third party reckless driver damages it, the owner is entitled to restitution from the thief under section 1202.4, subdivision (f), "because the owner has incurred losses resulting from the thief's criminal conduct (namely, the unlawful deprivation of his or her property) . . . ."  (*Martinez*, at p. 1105; see *People v. Pierce* (2015) 234 Cal.App.4th 1334, 1336–1337 [court did not err in ordering a defendant convicted of home invasion robbery to pay restitution, under § 1202.4, subd. (f), to the owner of a stolen car, utility companies, and a separate homeowner who suffered losses when a fleeing codefendant crashed the stolen car into a telephone pole].)

Additionally, the high court held that a court may "order restitution for losses incurred as a result of the means by which the defendant committed the offense." (*Martinez*, *supra*, 2 Cal.5th at pp. 1105–1106.)  The court illustrated this principle by way of example, explaining that, "if a burglar breaks a window to enter a home, he or she may be ordered to pay for the broken window in victim restitution, even though the burglary statute requires the prosecution to prove only that the defendant entered the house with the intent to commit a felony.  [Citation.]  If the burglar happens to have committed the prohibited entry by some means that causes damage to the home, a trial court certainly can—and must—take the damage into account in ordering restitution."  (*Id.* at p. 1106.)

*Martinez* supports a conclusion that Garton is a victim entitled to restitution for losses suffered as a result of defendant's criminal conduct.  As with the hypothetical owner of the stolen car in the high court's example, Garton suffered losses "resulting

from" defendant's criminal conduct of driving with implied malice and causing Solorio's death. (*Martinez*, *supra*, 2 Cal.5th at p. 1105.) Furthermore, defendant committed the murder, in part, by driving his vehicle through Garton's fence and into its equipment. As in our Supreme Court's hypothetical burglary example, Garton suffered losses resulting from the means by which defendant committed the crime, and this damage must be taken into account in ordering restitution. (*Id.* at p. 1106.)

Accordingly, the court did not err in ordering defendant to pay restitution to Garton.

## DISPOSITION

The matter is remanded for resentencing consistent with Senate Bill No. 567 and Assembly Bill No. 124. In all other respects, the judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.

33.